ERNST & ERNST *v.* HOCHFELDER ET AL.

No. 74–1042.   Argued December 3, 1975—Decided March 30, 1976

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, MARSHALL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 215. STEVENS, J., took no part in the consideration or decision of the case.

*Robert L. Berner, Jr.,* argued the cause for petitioner. With him on the briefs were *Francis D. Morrissey, Michael J. Madda,* and *Kenneth H. Lang.*

*Willard L. King* argued the cause and filed a brief for respondents Hochfelder et al. *Willard J. Lassers* argued the cause for respondents Allison et al. With him on the brief were *Donald L. Vetter, Leon M. Despres,* and *Alex Elson.*

*Paul Gonson* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Bork, Deputy Solicitor General Friedman, Lawrence E. Nerheim,* and *Charles E. H. Luedde.*\*

MR. JUSTICE POWELL delivered the opinion of the Court.

The issue in this case is whether an action for civil damages may lie under § 10 (b) of the Securities Exchange Act of 1934 (1934 Act), 48 Stat. 891, 15 U. S. C.

---

\**Kenneth J. Bialkin* and *Louis A. Craco* filed a brief for the American Institute of Certified Public Accountants as *amicus curiae* urging reversal.

§ 78j (b), and Securities and Exchange Commission Rule 10b–5, 17 CFR § 240.10b–5 (1975), in the absence of an allegation of intent to deceive, manipulate, or defraud on the part of the defendant.

I

Petitioner, Ernst & Ernst, is an accounting firm. From 1946 through 1967 it was retained by First Securities Company of Chicago (First Securities), a small brokerage firm and member of the Midwest Stock Exchange and of the National Association of Securities Dealers, to perform periodic audits of the firm's books and records. In connection with these audits Ernst & Ernst prepared for filing with the Securities and Exchange Commission (Commission) the annual reports required of First Securities under § 17 (a) of the 1934 Act, 15 U. S. C. § 78q (a).[1] It also prepared for First Securities responses to the financial questionnaires of the Midwest Stock Exchange (Exchange).

---

[1] Section 17 (a) requires that securities brokers or dealers "make . . . and preserve . . . such accounts . . . books, and other records, and make such reports, as the Commission by its rules and regulations may prescribe as necessary or appropriate in the public interest or for the protection of investors." During the period relevant here, Commission Rule 17a–5, 17 CFR § 240.17a–5 (1975), required that First Securities file an annual report of its financial condition that included a certificate stating "clearly the opinion of the accountant with respect to the financial statement covered by the certificate and the accounting principles and practices reflected therein." See SEC Release No. 3338 (Nov. 28, 1942), X–17A–5 (h). The Rule required Ernst & Ernst to state in its certificate, *inter alia,* "whether the audit was made in accordance with generally accepted auditing standards applicable in the circumstances" and provided that nothing in the Rule should "be construed to imply authority for the omission of any procedure which independent accountants would ordinarily employ in the course of an audit for the purpose of expressing the opinions required" by the Rule.

Respondents were customers of First Securities who invested in a fraudulent securities scheme perpetrated by Leston B. Nay, president of the firm and owner of 92% of its stock. Nay induced the respondents to invest funds in "escrow" accounts that he represented would yield a high rate of return. Respondents did so from 1942 through 1966, with the majority of the transactions occurring in the 1950's. In fact, there were no escrow accounts as Nay converted respondents' funds to his own use immediately upon receipt. These transactions were not in the customary form of dealings between First Securities and its customers. The respondents drew their personal checks payable to Nay or a designated bank for his account. No such escrow accounts were reflected on the books and records of First Securities, and none was shown on its periodic accounting to respondents in connection with their other investments. Nor were they included in First Securities' filings with the Commission or the Exchange.

This fraud came to light in 1968 when Nay committed suicide, leaving a note that described First Securities as bankrupt and the escrow accounts as "spurious." Respondents subsequently filed this action [2] for damages against Ernst & Ernst [3] in the United States District Court for the Northern District of Illinois under

[2] Two separate, but substantially identical, complaints initially were filed by different members of the present group of respondents. Subsequently the respondents jointly filed a First Amended Complaint. The two cases were treated by the District Court as if they were consolidated, and they were consolidated formally on appeal.

[3] The first count of the complaint was directed against the Exchange, charging that through its acts and omissions it had aided and abetted Nay's fraud. Summary judgment in favor of the Exchange was affirmed on appeal. *Hochfelder* v. *Midwest Stock Exchange,* 503 F. 2d 364 (CA7), cert. denied, 419 U. S. 875 (1974).

§ 10 (b) of the 1934 Act.  The complaint charged that Nay's escrow scheme violated § 10 (b) and Commission Rule 10b–5,[4] and that Ernst & Ernst had "aided and abetted" Nay's violations by its "failure" to conduct proper audits of First Securities.  As revealed through discovery, respondents' cause of action rested on a theory of negligent nonfeasance.  The premise was that Ernst & Ernst had failed to utilize "appropriate auditing procedures" in its audits of First Securities, thereby failing to discover internal practices of the firm said to prevent an effective audit.  The practice principally relied on was Nay's rule that only he could open mail addressed to him at First Securities or addressed to First Securities to his attention, even if it arrived in his absence.  Respondents contended that if Ernst & Ernst had conducted a proper audit, it would have discovered this "mail rule."  The existence of the rule then would have been disclosed in reports to the Exchange and to the Commission by Ernst & Ernst as an irregular procedure that prevented an effective audit.  This would have led to an investigation of Nay that would have revealed the fraudulent scheme.  Respondents specifically disclaimed the existence of fraud or intentional misconduct on the part of Ernst & Ernst.[5]

---

[4] Immediately after Nay's suicide the Commission commenced receivership proceedings against First Securities.  In those proceedings all of the respondents except two asserted claims based on the fraudulent escrow accounts.  These claims ultimately were allowed in *SEC* v. *First Securities Co.*, 463 F. 2d 981, 986 (CA7), cert. denied, 409 U. S. 880 (1972), where the court held that Nay's conduct violated § 10 (b) and Rule 10b–5, and that First Securities was liable for Nay's fraud as an aider and abettor.  The question of Ernst & Ernst's liability was not considered in that case.

[5] In their response to interrogatories in the District Court respondents conceded that they did "not accuse Ernst & Ernst of deliberate, intentional fraud," merely with "inexcusable negligence." App. 81.

After extensive discovery the District Court granted Ernst & Ernst's motion for summary judgment and dismissed the action. The court rejected Ernst & Ernst's contention that a cause of action for aiding and abetting a securities fraud could not be maintained under § 10 (b) and Rule 10b–5 merely on allegations of negligence. It concluded, however, that there was no genuine issue of material fact with respect to whether Ernst & Ernst had conducted its audits in accordance with generally accepted auditing standards.[6]

The Court of Appeals for the Seventh Circuit reversed and remanded, holding that one who breaches a duty of inquiry and disclosure owed another is liable in damages for aiding and abetting a third party's violation of Rule 10b–5 if the fraud would have been discovered or prevented but for the breach. 503 F. 2d 1100 (1974).[7]

---

[6] The District Court also held that respondents' action was barred by the doctrine of equitable estoppel and the applicable Illinois statute of limitations of three years. See n. 29, *infra*. As customers of First Securities respondents were sent confirmation forms as required under § 17 (a) and Rule 17a–5 requesting that they verify the accuracy of the statements and notify Ernst & Ernst as to any exceptions. Although the confirmation forms contained no reference to the escrow accounts, Ernst & Ernst was not notified of this fact. The last audit of First Securities by Ernst & Ernst was completed in December 1967 and the first complaint in this action was not filed until February 1971.

[7] In support of this holding, the Court of Appeals cited its decision in *Hochfelder* v. *Midwest Stock Exchange, supra,* where it detailed the elements necessary to establish a claim under Rule 10b–5 based on a defendant's aiding and abetting a securities fraud solely by inaction. See n. 3 *supra*. In such a case the plaintiff must show "that the party charged with aiding and abetting had knowledge of or, but for a breach of a duty of inquiry, should have had knowledge of the fraud, and that possessing such knowledge the party failed to act due to an improper motive or breach of a duty of disclosure." 503 F. 2d, at 374. The court explained in the instant case that these "elements comprise a flexible standard of liability

The court reasoned that Ernst & Ernst had a common-law and statutory duty of inquiry into the adequacy of First Securities' internal control system because it had contracted to audit First Securities and to prepare for filing with the Commission the annual report of First Securities' financial condition required under § 17 of the 1934 Act and Rule 17a–5.[8] The court further reasoned that respondents were beneficiaries of the statutory duty to inquire[9] and the related duty to disclose any material

which should be amplified according to the peculiarities of each case." *Id.*, at 1104. In view of our holding that an intent to deceive, manipulate, or defraud is required for civil liability under § 10 (b) and Rule 10b–5, we need not consider whether civil liability for aiding and abetting is appropriate under the section and the Rule, nor the elements necessary to establish such a cause of action. See, *e. g., Brennan* v. *Midwestern United Life Ins. Co.,* 259 F. Supp. 673 (1966) and 286 F. Supp. 702 (ND Ind. 1968), aff'd, 417 F. 2d 147 (CA7 1969), cert. denied, 397 U. S. 989 (1970) (defendant held liable for giving active and knowing assistance to a third party engaged in violations of the securities laws). See generally Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, *In Pari Delicto,* Indemnification and Contribution, 120 U. Pa. L. Rev. 597, 620–645 (1972).

[8] See n. 1, *supra.*

[9] The court concluded that the duty of inquiry imposed on Ernst & Ernst under § 17 (a) was "grounded on a concern for the protection of investors such as [respondents]," without reaching the question whether the statute imposed a "direct duty" to the respondents. 503 F. 2d, at 1105. The court held that Ernst & Ernst owed no common-law duty of inquiry to respondents arising from its contract with First Securities since Ernst & Ernst did not specifically foresee that respondents' limited class might suffer from a negligent audit, compare *Glanzer* v. *Shepard,* 233 N. Y. 236, 135 N. E. 275 (1922), with *Ultramares Corp.* v. *Touche,* 255 N. Y. 170, 174 N. E. 441 (1931); see, *e. g., Rhode Island Hospital Trust Nat. Bank* v. *Swartz,* 455 F. 2d 847, 851 (CA4 1972). Moreover, respondents conceded that they did not rely on the financial statements and reports prepared by Ernst & Ernst or on its certificate of opinion. 503 F. 2d, at 1107.

irregularities that were discovered. 503 F. 2d, at 1105–1111. The court concluded that there were genuine issues of fact as to whether Ernst & Ernst's failure to discover and comment upon Nay's mail rule [10] constituted a breach of its duties of inquiry and disclosure, *id.,* at 1111, and whether inquiry and disclosure would have led to the discovery or prevention of Nay's fraud. *Id.,* at 1115.[11]

We granted certiorari to resolve the question whether a private cause of action for damages will lie under § 10 (b) and Rule 10b–5 in the absence of any allegation of "scienter"—intent to deceive, manipulate, or defraud.[12] 421 U. S. 909 (1975). We conclude that it will not and therefore we reverse.[13]

---

[10] In their briefs respondents allude to several other alleged failings by Ernst & Ernst in its audit of First Securities, principally its failure to inquire into the collectibility of certain loans by First Securities to Nay and and its failure to follow up on a 1965 memorandum that characterized First Securities' overall system of internal control as weak because of the centralization of functions in the cashier. The Court of Appeals mentioned none of these alleged deficiencies in its opinion in this case, although it did discuss the loans to Nay and certain other related matters in its opinion in *Hochfelder* v. *Midwest Stock Exchange,* 503 F. 2d, at 370–371, holding that the existence of these facts was insufficient to put the Exchange on notice that further inquiry into First Securities' financial affairs was required.

[11] The Court of Appeals also reversed the District Court's holding with respect to equitable estoppel and the statute of limitations. See n. 6, *supra.* In view of our disposition of the case we need not address these issues.

[12] Although the verbal formulations of the standard to be applied have varied, several Courts of Appeals have held in substance that negligence alone is sufficient for civil liability under § 10 (b) and Rule 10b–5. See, *e. g., White* v. *Abrams,* 495 F. 2d 724, 730 (CA9 1974) ("flexible duty" standard); *Myzel* v. *Fields,* 386 F. 2d 718, 735 (CA8 1967), cert. denied, 390 U. S. 951 (1968) (negligence suffi-

## II

Federal regulation of transactions in securities emerged as part of the aftermath of the market crash in 1929.

cient); *Kohler* v. *Kohler Co.*, 319 F. 2d 634, 637 (CA7 1963) (knowledge not required). Other Courts of Appeals have held that some type of scienter—*i. e.*, intent to defraud, reckless disregard for the truth, or knowing use of some practice to defraud—is necessary in such an action. See, *e. g.*, *Clegg* v. *Conk*, 507 F. 2d 1351, 1361–1362 (CA10 1974), cert. denied, 422 U. S. 1007 (1975) (an element of "scienter or conscious fault"); *Lanza* v. *Drexel & Co.*, 479 F. 2d 1277, 1306 (CA2 1973) ("willful or reckless disregard" of the truth). But few of the decisions announcing that some form of negligence suffices for civil liability under § 10 (b) and Rule 10b–5 actually have involved only negligent conduct. *Smallwood* v. *Pearl Brewing Co.*, 489 F. 2d 579, 606 (CA5), cert. denied, 419 U. S. 873 (1974); *Kohn* v. *American Metal Climax, Inc.*, 458 F. 2d 255, 286 (CA3 1972) (Adams, J., concurring and dissenting); Bucklo, Scienter and Rule 10b–5, 67 Nw. U. L. Rev. 562, 568–570 (1972).

In this opinion the term "scienter" refers to a mental state embracing intent to deceive, manipulate, or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10 (b) and Rule 10b–5.

Since this case concerns an action for damages we also need not consider the question whether scienter is a necessary element in an action for injunctive relief under § 10 (b) and Rule 10b–5. Cf. *SEC* v. *Capital Gains Research Bureau*, 375 U. S. 180 (1963).

[13] Respondents further contend that Ernst & Ernst owed them a direct duty under § 17 (a) of the 1934 Act and Rule 17a–5 to conduct a proper audit of First Securities and that they may base a private cause of action against Ernst & Ernst for violation of that duty. Respondents' cause of action, however, was premised solely on the alleged violation of § 10 (b) and Rule 10b–5. During the lengthy history of this litigation they have not amended their original complaint to aver a cause of action under § 17 (a) and Rule 17a–5. We therefore do not consider that a claim of liability under § 17 (a) is properly before us even assuming respondents could assert such a claim independently of § 10 (b).

The Securities Act of 1933 (1933 Act), 48 Stat. 74, as amended, 15 U. S. C. § 77a *et seq.*, was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing. See H. R. Rep. No. 85, 73d Cong., 1st Sess., 1–5 (1933). The 1934 Act was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets, and to impose regular reporting requirements on companies whose stock is listed on national securities exchanges. See S. Rep. No. 792, 73d Cong., 2d Sess., 1–5 (1934). Although the Acts contain numerous carefully drawn express civil remedies and criminal penalties, Congress recognized that efficient regulation of securities trading could not be accomplished under a rigid statutory program. As part of the 1934 Act Congress created the Commission, which is provided with an arsenal of flexible enforcement powers. See, *e. g.*, 1933 Act §§ 8, 19, 20, 15 U. S. C. §§ 77h, 77s, 77t; 1934 Act §§ 9, 19, 21, 15 U. S. C. §§ 78i, 78s, 78u.

Section 10 of the 1934 Act makes it "unlawful for any person . . . (b) [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U. S. C. § 78j. In 1942, acting pursuant to the power conferred by § 10 (b), the Commission promulgated Rule 10b–5, which now provides:

> "Employment of manipulative and deceptive devices.

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security."

Although § 10 (b) does not by its terms create an express civil remedy for its violation, and there is no indication that Congress,[14] or the Commission when adopting Rule 10b–5,[15] contemplated such a remedy, the existence of a private cause of action for violations of the statute and the Rule is now well established. *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 730 (1975); *Affiliated Ute Citizens* v. *United States*, 406 U. S. 128, 150–154 (1972); *Superintendent of Insurance* v. *Bankers Life & Cas. Co.*, 404 U. S. 6, 13 n. 9 (1971). During the 30-year period since a private cause of action was first implied under § 10 (b) and Rule 10b–5,[16]

---

[14] See, *e. g.*, S. Rep. No. 792, 73d Cong., 2d Sess., 5–6 (1934); Note, Implied Liability Under the Securities Exchange Act, 61 Harv. L. Rev. 858, 860 (1948).

[15] SEC Release No. 3230 (May 21, 1942); *Birnbaum* v. *Newport Steel Corp.*, 193 F. 2d 461, 463 (CA2), cert. denied, 343 U. S. 956 (1952).

[16] *Kardon* v. *National Gypsum Co.*, 69 F. Supp. 512 (ED Pa. 1946).

a substantial body of case law and commentary has developed as to its elements. Courts and commentators long have differed with regard to whether scienter is a necessary element of such a cause of action, or whether negligent conduct alone is sufficient.[17] In addressing this question, we turn first to the language of § 10 (b), for "[t]he starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps, supra,* at 756 (POWELL, J., concurring); see *FTC* v. *Bunte Bros., Inc.,* 312 U. S. 349, 350 (1941).

## A

Section 10 (b) makes unlawful the use or employment of "any manipulative or deceptive device or contrivance" in contravention of Commission rules. The words "manipulative or deceptive" used in conjunction with "device or contrivance" strongly suggest that § 10 (b) was intended to proscribe knowing or intentional misconduct. See *SEC* v. *Texas Gulf Sulphur Co.,* 401 F. 2d 833, 868 (CA2 1968) (Friendly, J., concurring), cert. denied *sub nom. Coates* v. *SEC,* 394 U. S. 976 (1969); Loss, Summary Remarks, 30 Bus. Law. 163, 165 (Special Issue 1975). See also *Kohn* v. *American Metal Climax, Inc.,* 458 F. 2d 255, 280 (CA3 1972) (Adams, J., concurring and dissenting).

In its *amicus curiae* brief, however, the Commission contends that nothing in the language "manipulative or deceptive device or contrivance" limits its operation to

---

[17] See cases cited in n. 12, *supra.* Compare, *e. g.,* Comment, Scienter and Rule 10b–5, 69 Col. L. Rev. 1057, 1080–1081 (1969); Note, Negligent Misrepresentations under Rule 10b–5, 32 U. Chi. L. Rev. 824, 839–844 (1965); Note, Securities Acts, 82 Harv. L. Rev. 938, 947 (1969); Note, Civil Liability Under Section 10B and Rule 10B–5: A Suggestion for Replacing the Doctrine of Privity, 74 Yale L. J. 658, 682–689 (1965), with, *e. g.,* 3 L. Loss, Securities Regulation 1766 (2d ed. 1961); 6 *id.,* at 3883–3885 (1969).

knowing or intentional practices.[18]   In support of its view, the Commission cites the overall congressional purpose in the 1933 and 1934 Acts to protect investors against false and deceptive practices that might injure them.   See *Affiliated Ute Citizens* v. *United States, supra,* at 151; *Superintendent of Insurance* v. *Bankers Life & Cas. Co., supra,* at 11–12; *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 432–433 (1964).   See also *SEC* v. *Capital Gains Res. Bur.,* 375 U. S. 180, 195 (1963). The Commission then reasons that since the "effect" upon investors of given conduct is the same regardless of whether the conduct is negligent or intentional, Congress must have intended to bar all such practices and not just those done knowingly or intentionally.   The logic of this effect-oriented approach would impose liability for wholly faultless conduct where such conduct results in harm to investors, a result the Commission would be unlikely to support.   But apart from where its logic might

---

[18] The Commission would not permit recovery upon proof of negligence in all cases.   In order to harmonize civil liability under § 10 (b) with the express civil remedies contained in the 1933 and 1934 Acts, the Commission would limit the circumstances in which civil liability could be imposed for negligent violation of Rule 10b–5 to situations in which (i) the defendant knew or reasonably could foresee that the plaintiff would rely on his conduct, (ii) the plaintiff did in fact so rely, and (iii) the amount of the plaintiff's damages caused by the defendant's conduct was definite and ascertainable.   Brief for SEC as *Amicus Curiae* 23–33.   The Commission concludes that the present record does not establish these conditions since Ernst & Ernst could not reasonably have foreseen that the financial statements of First Securities would induce respondents to invest in the escrow accounts, respondents in fact did not rely on Ernst & Ernst's audits, and the amount of respondents' damages was unascertainable.   *Id.,* at 33–36.   Respondents accept the Commission's basic analysis of the operative language of the statute and Rule, but reject these additional requirements for recovery for negligent violations.

lead, the Commission would add a gloss to the operative language of the statute quite different from its commonly accepted meaning. See, e. g., Addison v. Holly Hill Fruit Products, Inc., 322 U. S. 607, 617–618 (1944).[19] The argument simply ignores the use of the words "manipulative," "device," and "contrivance"—terms that make unmistakable a congressional intent to proscribe a type of conduct quite different from negligence.[20] Use of the word "manipulative" is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.[21]

In addition to relying upon the Commission's argument with respect to the operative language of the stat-

---

[19] "To let general words draw nourishment from their purpose is one thing. To draw on some unexpressed spirit outside the bounds of the normal meaning of words is quite another. . . . After all, legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him." Addison v. Holly Hill Fruit Products, Inc., 322 U. S., at 617–618. See Frankfurter, Some Reflections on the Reading of Statutes, 47 Col. L. Rev. 527, 536–537 (1947).

[20] Webster's International Dictionary (2d ed. 1934) defines "device" as "[t]hat which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice," and "contrivance" in pertinent part as "[a] thing contrived or used in contriving; a scheme, plan, or artifice." In turn, "contrive" in pertinent part is defined as "[t]o devise; to plan; to plot . . . [t]o fabricate . . . design; invent . . . to scheme . . . ." The Commission also ignores the use of the terms "[t]o use or employ," language that is supportive of the view that Congress did not intend § 10 (b) to embrace negligent conduct.

[21] Webster's International Dictionary, supra, defines "manipulate" as "to manage or treat artfully or fraudulently; as to manipulate accounts . . . . 4. Exchanges. To force (prices) up or down, as by matched orders, wash sales, fictitious reports . . . ; to rig."

ute, respondents contend that since we are dealing with "remedial legislation," *Tcherepnin* v. *Knight,* 389 U. S. 332, 336 (1967), it must be construed " 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' " *Affiliated Ute Citizens* v. *United States,* 406 U. S., at 151, quoting *SEC* v. *Capital Gains Research Bureau, supra,* at 195. They argue that the "remedial purposes" of the Acts demand a construction of § 10 (b) that embraces negligence as a standard of liability. But in seeking to accomplish its broad remedial goals, Congress did not adopt uniformly a negligence standard even as to express civil remedies. In some circumstances and with respect to certain classes of defendants, Congress did create express liability predicated upon a failure to exercise reasonable care. *E. g.,* 1933 Act § 11 (b)(3)(B), 48 Stat. 82, as amended, 15 U. S. C. § 77k (b)(3)(B) (liability of "experts," such as accountants, for misleading statements in portions of registration statements for which they are responsible).[22] But in other situations good faith is an absolute defense. 1934 Act § 18, 48 Stat. 897, as amended, 15 U. S. C. § 78r (misleading statements in any document filed pursuant to the 1934 Act). And in still other circumstances Congress created express liability regardless of the defendant's fault, 1933 Act § 11 (a), 15 U. S. C. § 77k (a) (issuer liability for misleading statements in the registration statement).

It is thus evident that Congress fashioned standards of fault in the express civil remedies in the 1933 and 1934 Acts on a particularized basis. Ascertainment of congressional intent with respect to the standard of liability created by a particular section of the Acts must therefore rest primarily on the language of that section. Where, as here, we deal with a judicially implied liability, the statutory language certainly

---

[22] See *infra,* at 208, and n. 26.

is no less important. In view of the language of
§ 10 (b), which so clearly connotes intentional miscon-
duct, and mindful that the language of a statute con-
trols when sufficiently clear in its context, *United States
v. Oregon*, 366 U. S. 643, 648 (1961); *Packard Motor
Car Co.* v. *NLRB*, 330 U. S. 485, 492 (1947), further
inquiry may be unnecessary. We turn now, neverthe-
less, to the legislative history of the 1934 Act to ascertain
whether there is support for the meaning attributed to
§ 10 (b) by the Commission and respondents.

### B

Although the extensive legislative history of the 1934
Act is bereft of any explicit explanation of Congress'
intent, we think the relevant portions of that history
support our conclusion that § 10 (b) was addressed to
practices that involve some element of scienter and can-
not be read to impose liability for negligent conduct
alone.

The original version of what would develop into the
1934 Act was contained in identical bills introduced by
Senator Fletcher and Representative Rayburn. S. 2693,
73d Cong., 2d Sess. (1934); H. R. 7852, 73d Cong., 2d
Sess. (1934). Section 9 (c) of the bills, from which pres-
ent § 10 (b) evolved, proscribed as unlawful the use of
"any device or contrivance which, or any device or con-
trivance in a way or manner which the Commission may
by its rules and regulations find detrimental to the pub-
lic interest or to the proper protection of investors." The
other subsections of proposed § 9 listed specific practices
that Congress empowered the Commission to regulate
through its rulemaking power. See §§ 9 (a) (short
sale), (b) ("stop-loss order"). Soon after the hearings
on the House bill were held, a substitute bill was intro-
duced in both Houses which abbreviated and modified

§ 9 (c)'s operative language to read "any manipulative device or contrivance." H. R. 8720, 73d Cong., 2d Sess., § 9 (c) (1934); see S. 3420, 73d Cong., 2d Sess., § 10 (b) (1934). Still a third bill, retaining the Commission's power to regulate the specific practices enumerated in the prior bills, and omitting all reference to the Commission's authority to prescribe rules concerning manipulative or deceptive devices in general, was introduced and passed in the House. H. R. 9323, 73d Cong., 2d Sess., § 9 (1934). The final language of § 10 is a modified version of a Senate amendment to this last House bill. See H. R. Conf. Rep. No. 1838, 73d Cong., 2d Sess., 32–33 (1934).

Neither the intended scope of § 10 (b) nor the reasons for the changes in its operative language are revealed explicitly in the legislative history of the 1934 Act, which deals primarily with other aspects of the legislation. There is no indication, however, that § 10 (b) was intended to proscribe conduct not involving scienter. The extensive hearings that preceded passage of the 1934 Act touched only briefly on § 10, and most of the discussion was devoted to the enumerated devices that the Commission is empowered to proscribe under § 10 (a). The most relevant exposition of the provision that was to become § 10 (b) was by Thomas G. Corcoran, a spokesman for the drafters. Corcoran indicated:

"Subsection (c) [§ 9 (c) of H. R. 7852—later § 10 (b)] says, 'Thou shalt not devise any other cunning devices.'

.    .    .    .    .

"Of course subsection (c) is a catch-all clause to prevent manipulative devices. I do not think there is any objection to that kind of clause. The Commission should have the authority to deal with new manipulative devices." Hearings on H. R. 7852

and H. R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 115 (1934).

This brief explanation of § 10 (b) by a spokesman for its drafters is significant. The section was described rightly as a "catchall" clause to enable the Commission "to deal with new manipulative [or cunning] devices." It is difficult to believe that any lawyer, legislative draftsman, or legislator would use these words if the intent was to create liability for merely negligent acts or omissions.[23] Neither the legislative history nor the briefs supporting respondents identify any usage or authority for construing "manipulative [or cunning] devices" to include negligence.[24]

---

[23] See n. 21, *supra*.

[24] In support of its position the Commission cites statements by Corcoran in the Senate hearings that "in modern society there are many things you have to make crimes which are sheer matters of negligence" and "intent is not necessary for every crime." Hearings before the Subcommittee on Stock Exchange Practices before the Senate Committee on Banking and Currency, 73d Cong., 2d Sess., 6509–6510 (1934). The comments, taken in context, shed no light on the meaning of § 10 (b). Corcoran's remarks were made during a discussion of whether criminal violations could arise under §§ 8 (a) (3) of S. 2693, 73d Cong., 2d Sess., which in material part was incorporated in § 9 of the 1934 Act, 15 U. S. C. § 78i, in the absence of specific intent to influence security prices for personal gain. The remarks, moreover, were not addressed to the scope of § 8, but were general observations concerning activity society might proscribe under criminal law. Ferdinand Pecora, counsel to the committee and a draftsman of S. 2693, *Foremost-McKesson, Inc.* v. *Provident Securities Co.*, 423 U. S. 232, 249–250, n. 24 (1976), described the language as "[e]xcluding from its scope an act that is not done with any ulterior motives or purposes, as set forth in the act." Hearings before the Subcommittee on Stock Exchange Practices, *supra*, at 6510. Further, prior to the passage of the 1934 Act, proposed § 8 was amended to require willful behavior as a prerequisite to civil liability

The legislative reports do not address the scope of § 10 (b) or its catchall function directly. In considering specific manipulative practices left to Commission regulation, however, the reports indicate that liability would not attach absent scienter, supporting the conclusion that Congress intended no lesser standard under § 10 (b). The Senate Report of S. 3420 discusses generally the various abuses that precipitated the need for the legislation and the inadequacy of self-regulation by the stock exchanges. The Report then analyzes the component provisions of the statute, but does not parse § 10. The only specific reference to § 10 is the following:

"In addition to the discretionary and elastic powers conferred on the administrative authority, effective regulation must include several clear statutory provisions reinforced by penal and civil sanctions, aimed at those manipulative and deceptive practices which have been demonstrated to fulfill no useful

for violations. Compare § 9 (e) of the 1934 Act with § 8 (c) of S. 2693. See H. R. Rep. No. 1383, 73d Cong., 2d Sess., 21 (1934).

The Commission also relies on objections to a draft version of § 10 (b)—§ 9 (c) of S. 2693 and H. R. 7852, see *supra,* at 201–202—raised by representatives of the securities industry in the House and Senate hearings. They warned that the language was so vague that the Commission might outlaw anything. *E. g.,* Hearings before the Subcommittee on Stock Exchange Practices, *supra,* at 6988; Hearings on H. R. 7852 and H. R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 258 (1934). Remarks of this kind made in the course of legislative debate or hearings other than by persons responsible for the preparation or the drafting of a bill are entitled to little weight. See, *e. g., United States* v. *United Mine Workers,* 330 U. S. 258, 276–277 (1947); *United States* v. *Wrightwood Dairy Co.,* 315 U. S. 110, 125 (1942). This is especially so with regard to the statements of legislative opponents who "[i]n their zeal to defeat a bill . . . understandably tend to overstate its reach." *NLRB* v. *Fruit Packers,* 377 U. S. 58, 66 (1964). See *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384, 394–395 (1951).

function. These sanctions are found in sections 9, 10 and 16." S. Rep. No. 792, 73d Cong., 2d Sess., 6 (1934).

In the portion of the general-analysis section of the Report entitled Manipulative Practices, however, there is a discussion of specific practices that were considered so inimical to the public interest as to require express prohibition, such as "wash" sales and "matched" orders,[25] and of other practices that might in some cases serve legitimate purposes, such as stabilization of security prices and grants of options. *Id.*, at 7–9. These latter practices were left to regulation by the Commission. 1934 Act §§ 9 (a)(6), (c), 48 Stat. 890, 15 U. S. C. §§ 78i (a)(6), (c). Significantly, we think, in the discussion of the need to regulate even the latter category of practices when they are manipulative, there is no indication that any type of criminal or civil liability is to attach in the absence of scienter. Furthermore, in commenting on the express civil liabilities provided in the 1934 Act, the Report explains:

"[I]f an investor has suffered loss by reason of illicit practices, it is equitable that he should be allowed to recover damages from the guilty party. . . . [T]he bill provides that any person who unlaw-

---

[25] "Wash" sales are transactions involving no change in beneficial ownership. "Matched" orders are orders for the purchase/sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security. Section 9 (a)(1) of the 1934 Act, 15 U. S. C. § 78i (a)(1), proscribes wash sales and matched orders when effectuated "[f]or the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or . . . with respect to the market for any such security." See *In re J. A. Latimer & Co.*, 38 S. E. C. 790 (1958); *In re Thornton & Co.*, 28 S. E. C. 208 (1948).

fully manipulates the price of a security, or who induces transactions in a security by means of false or misleading statements, or who makes a false or misleading statement in the report of a corporation, shall be liable in damages to those who have bought or sold the security at prices affected by such violation or statement. In such case the burden is on the plaintiff to show the violation or the fact that the statement was false or misleading, and that he relied thereon to his damage. The defendant may escape liability by showing that the statement was made in *good faith.*" S. Rep. No. 792, *supra,* at 12–13 (emphasis supplied).

The Report therefore reveals with respect to the specified practices, an overall congressional intent to prevent "manipulative and deceptive practices which . . . fulfill no useful function" and to create private actions for damages stemming from "illicit practices," where the defendant has not acted in good faith. The views expressed in the House Report are consistent with this interpretation. H. R. Rep. No. 1383, 73d Cong., 2d Sess., 10–11, 20–21 (1934) (H. R. 9323). There is no indication that Congress intended anyone to be made liable for such practices unless he acted other than in good faith. The catchall provision of § 10 (b) should be interpreted no more broadly.

## C

The 1933 and 1934 Acts constitute interrelated components of the federal regulatory scheme governing transactions in securities. See *Blue Chip Stamps,* 421 U. S., at 727–730. As the Court indicated in *SEC* v. *National Securities, Inc.,* 393 U. S. 453, 466 (1969), "the interdependence of the various sections of the securities laws is certainly a relevant factor in any interpretation of the language Congress has chosen . . . ." Recognizing this,

respondents and the Commission contrast § 10 (b) with other sections of the Acts to support their contention that civil liability may be imposed upon proof of negligent conduct. We think they misconceive the significance of the other provisions of the Acts.

The Commission argues that Congress has been explicit in requiring willful conduct when that was the standard of fault intended, citing § 9 of the 1934 Act, 48 Stat. 889, 15 U. S. C. § 78i, which generally proscribes manipulation of securities prices. Sections 9 (a)(1) and (a)(2), for example, respectively prohibit manipulation of security prices "[f]or the purpose of creating a false or misleading appearance of active trading in any security . . . or . . . with respect to the market for any such security," and "for the purpose of inducing the purchase or sale of such security by others." See also § 9 (a)(4). Section 9 (e) then imposes upon "[a]ny person who willfully participates in any act or transaction in violation of" other provisions of § 9 civil liability to anyone who purchased or sold a security at a price affected by the manipulative activities. From this the Commission concludes that since § 10 (b) is not by its terms explicitly restricted to willful, knowing, or purposeful conduct, it should not be construed in all cases to require more than negligent action or inaction as a precondition for civil liability.

The structure of the Acts does not support the Commission's argument. In each instance that Congress created express civil liability in favor of purchasers or sellers of securities it clearly specified whether recovery was to be premised on knowing or intentional conduct, negligence, or entirely innocent mistake. See 1933 Act, §§ 11, 12, 15, 48 Stat. 82, 84, as amended, 15 U. S. C. §§ 77k, 77l, 77o; 1934 Act §§ 9, 18, 20, 48 Stat. 889, 897, 899, as amended, 15 U. S. C. §§ 78i, 78r, 78t. For example, § 11 of the 1933 Act unambigu-

ously creates a private action for damages when a registration statement includes untrue statements of material facts or fails to state material facts necessary to make the statements therein not misleading. Within the limits specified by § 11 (e), the issuer of the securities is held absolutely liable for any damages resulting from such misstatement or omission. But experts such as accountants who have prepared portions of the registration statement are accorded a "due diligence" defense. In effect, this is a negligence standard. An expert may avoid civil liability with respect to the portions of the registration statement for which he was responsible by showing that "after reasonable investigation" he had "reasonable ground[s] to believe" that the statements for which he was responsible were true and there was no omission of a material fact.[26]  § 11 (b)(3)(B)(i). See, e. g., Escott v. Barchris Constr. Corp., 283 F. Supp. 643, 697–703 (SDNY 1968). The express recognition of a cause of action premised on negligent behavior in § 11 stands in sharp contrast to the language of § 10 (b), and significantly undercuts the Commission's argument.

We also consider it significant that each of the express civil remedies in the 1933 Act allowing recovery for negligent conduct, see §§ 11, 12 (2), 15, 15 U. S. C. §§ 77k, 77l

---

[26] Other individuals who sign the registration statement, directors of the issuer, and the underwriter of the securities similarly are accorded a complete defense against civil liability based on the exercise of reasonable investigation and a reasonable belief that the registration statement was not misleading. §§ 11 (b)(3)(A), (C), (D), (c). See, e. g., Feit v. Leasco Data Processing Equipment Corp., 332 F. Supp. 544, 575–583 (EDNY 1971) (underwriters, but not officer-directors, established their due-diligence defense). See generally R. Jennings & H. Marsh, Securities Regulation 1018–1027 (3d ed. 1972), and sources cited therein; Folk, Civil Liabilities Under the Federal Securities Acts: The Barchris Case, 55 Va. L. Rev. 199 (1969).

(2), 77o,[27] is subject to significant procedural restrictions not applicable under § 10 (b).[28]   Section 11 (e) of the 1933 Act, for example, authorizes the court to require a

[27] Section 12 (2) creates potential civil liability for a seller of securities in favor of the purchaser for misleading statements or omissions in connection with the transaction.   The seller is exculpated if he proves that he did not know, or, in the exercise of reasonable care, could not have known of the untruth or omission. Section 15 of the 1933 Act, as amended by § 208 of Title II of the 1934 Act, makes persons who "control" any person liable under § 11 or § 12 liable jointly and severally to the same extent as the controlled person, unless he "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."   15 U. S. C. § 77o.   See Act of June 6, 1934, c. 404, § 208, 48 Stat. 908.

[28] Each of the provisions of the 1934 Act that expressly create civil liability, except those directed to specific classes of individuals such as directors, officers, or 10% beneficial holders of securities, see § 16 (b), 15 U. S. C. § 78p (b), *Foremost-McKesson, Inc.* v. *Provident Securities Co.*, 423 U. S. 232 (1976); *Kern County Land Co.* v. *Occidental Petroleum Corp.*, 411 U. S. 582 (1973), contains a state-of-mind condition requiring something more than negligence.   Section 9 (e) creates potential civil liability for any person who "willfully participates" in the manipulation of securities on a national exchange.   15 U. S. C. § 78i (e).   Section 18 creates potential civil liability for misleading statements filed with the Commission, but provides the defendant with the defense that "he acted in good faith and had no knowledge that such statement was false or misleading." 15 U. S. C. § 78r.   And § 20, which imposes liability upon "controlling person[s]" for violations of the Act by those they control, exculpates a defendant who "acted in good faith and did not . . . induce the act . . . constituting the violation . . . ."   15 U. S. C. § 78t.   Emphasizing the important difference between the operative language and purpose of § 14 (a) of the 1934 Act, 15 U. S. C. § 78n (a), as contrasted with § 10 (b), however, some courts have concluded that proof of scienter is unnecessary in an action for damages by the shareholder recipients of a materially misleading proxy statement against the issuer corporation.   *Gerstle* v. *Gamble-Skogmo, Inc.*, 478 F. 2d 1281, 1299 (CA2 1973).   See also *Kohn* v. *American Metal Climax, Inc.*, 458 F. 2d, at 289–290 (Adams, J., concurring and dissenting).

plaintiff bringing a suit under § 11, § 12 (2), or § 15 thereof to post a bond for costs, including attorneys' fees, and in specified circumstances to assess costs at the conclusion of the litigation. Section 13 specifies a statute of limitations of one year from the time the violation was or should have been discovered, in no event to exceed three years from the time of offer or sale, applicable to actions brought under § 11, § 12 (2), or § 15. These restrictions, significantly, were imposed by amendments to the 1933 Act adopted as part of the 1934 Act. Prior to amendment § 11 (e) contained no provision for payment of costs. Act of May 27, 1933, c. 38, § 11 (e), 48 Stat. 83. See Act of June 6, 1934, c. 404, § 206 (e), 48 Stat. 907. The amendments also substantially shortened the statute of limitations provided by § 13. Compare § 13, 48 Stat. 84, with 15 U. S. C. § 77m. See 1934 Act, § 207, 48 Stat. 908. We think these procedural limitations indicate that the judicially created private damages remedy under § 10 (b)—which has no comparable restrictions [29]—cannot be extended, consistently with the intent of Congress, to actions premised on negligent wrongdoing. Such extension would allow causes of action covered by §§ 11, 12 (2), and 15 to be brought instead under § 10 (b) and thereby nullify the effectiveness of the carefully drawn procedural restrictions on these express actions.[30] See, *e. g., Fisch-*

---

[29] Since no statute of limitations is provided for civil actions under § 10 (b), the law of limitations of the forum State is followed as in other cases of judicially implied remedies. See *Holmberg* v. *Armbrecht,* 327 U. S. 392, 395 (1946), and cases cited therein. Although it is not always certain which state statute of limitations should be followed, such statutes of limitations usually are longer than the period provided under § 13. 3 Loss, *supra,* n. 17, at 1773–1774. As to costs see n. 30, *infra.*

[30] Congress regarded these restrictions on private damages actions as significant. In introducing Title II of the 1934 Act, Senator

*man* v. *Raytheon Mfg. Co.,* 188 F. 2d 783, 786–787 (CA2 1951); *SEC* v. *Texas Gulf Sulphur Co.,* 401 F. 2d, at 867–868 (Friendly, J., concurring); *Rosenberg* v. *Globe Aircraft Corp.,* 80 F. Supp. 123, 124 (ED Pa. 1948); 3 Loss, *supra,* n. 17, at 1787–1788; R. Jennings & H. Marsh, Securities Regulation 1070–1074 (3d ed. 1972). We would be unwilling to bring about this result absent substantial support in the legislative history, and there is none.[31]

---

Fletcher indicated that the amendment to § 11 (e) of the 1933 Act, providing for potential payment of costs, including attorneys' fees, "is the most important [amendment] of all." 78 Cong. Rec. 8669 (1934). One of its purposes was to deter actions brought solely for their potential settlement value. See *ibid.;* H. R. Conf. Rep. No. 1838, 73d Cong., 2d Sess., 42 (1934); *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 740–741 (1975). This deterrent is lacking in the § 10 (b) context, in which a district court's power to award attorneys' fees is sharply circumscribed. See *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U. S. 240 (1975) ("bad faith" requirement); *F. D. Rich Co.* v. *United States ex rel. Industrial Lumber Co.,* 417 U. S. 116, 129 (1974).

[31] Section 18 of the 1934 Act creates a private cause of action against persons, such as accountants, who "make or cause to be made" materially misleading statements in reports or other documents filed with the Commission. 15 U. S. C. § 78r. We need not consider the question whether a cause of action may be maintained under § 10 (b) on the basis of actions that would constitute a violation of § 18. Under § 18 liability extends to persons who, in reliance on such statements, purchased or sold a security whose price was affected by the statements. Liability is limited, however, in the important respect that the defendant is accorded the defense that he acted in "good faith and had no knowledge that such statement was false or misleading." Consistent with this language the legislative history of the section suggests something more than negligence on the part of the defendant is required for recovery. The original version of § 18 (a), § 17 (a) of S. 2693, H. R. 7852 and H. R. 7855, see *supra,* at 201–202, provided that the defendant would not be liable if "he acted in good faith and in the exercise of reasonable care had no ground to believe that such statement was false

## D

We have addressed, to this point, primarily the language and history of § 10 (b). The Commission contends, however, that subsections (b) and (c) of Rule 10b–5 are cast in language which—if standing alone— could encompass both intentional and negligent behavior. These subsections respectively provide that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . ." and "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . ." Viewed in isolation the language of subsection (b), and arguably that of subsection (c), could be read as proscribing, respectively, any type of material misstatement or omission, and any course of conduct, that has the effect of defrauding investors, whether the wrongdoing was intentional or not.

We note first that such a reading cannot be harmonized with the administrative history of the Rule, a history making clear that when the Commission adopted the Rule it was intended to apply only to activities that involved scienter.[32] More importantly, Rule 10b–5 was

___

or misleading." The accounting profession objected to this provision on the ground that liability would be created for honest errors in judgment. See Senate Hearings on Stock Exchange Practices, *supra*, n. 24, at 7175–7183; House Hearings on H. R. 7852 and H. R. 8720, *supra*, n. 24, at 653. In subsequent drafts the current formulation was adopted. It is also significant that actions under § 18 are limited by a relatively short statute of limitations similar to that provided in § 13 of the 1933 Act. § 18 (c). Moreover, as under § 11 (e) of the 1933 Act a district court is authorized to require the plaintiff to post a bond for costs, including attorneys' fees, and to assess such costs at the conclusion of the litigation. § 18 (a).

[32] Apparently the Rule was a hastily drafted response to a situation clearly involving intentional misconduct. The Commission's

adopted pursuant to authority granted the Commission under § 10 (b). The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather,

Regional Administrator in Boston had reported to the Director of the Trading and Exchange Division that the president of a corporation was telling the other shareholders that the corporation was doing poorly and purchasing their shares at the resultant depressed prices, when in fact the business was doing exceptionally well. The Rule was drafted and approved on the day this report was received. See Conference on Codification of the Federal Securities Laws, 22 Bus. Law. 793, 922 (1967) (remarks of Milton Freeman, one of the Rule's codrafters); Blue Chip Stamps, supra, at 767 (BLACKMUN, J., dissenting). Although adopted pursuant to § 10 (b), the language of the Rule appears to have been derived in significant part from § 17 of the 1933 Act, 15 U. S. C. § 77q. E. g., Blue Chip Stamps, supra, at 767 (BLACKMUN, J., dissenting); SEC v. Texas Gulf Sulphur Co., 401 F. 2d 833, 867 (CA2 1968) (Friendly, J., concurring), cert. denied sub nom. Coates v. SEC, 394 U. S. 976 (1969). There is no indication in the administrative history of the Rule that any of the subsections was intended to proscribe conduct not involving scienter. Indeed the Commission's release issued contemporaneously with the Rule explained:

"The Securities and Exchange Commission today announced the adoption of a rule prohibiting fraud by any person in connection with the purchase of securities. The previously existing rules against fraud in the purchase of securities applied only to brokers and dealers. The new rule closes a loophole in the protections against fraud administered by the Commission by prohibiting individuals or companies from buying securities if they engage in fraud in their purchase." SEC Release No. 3230 (May 21, 1942).

That same year, in its Annual Report, the Commission again stated that the purpose of the Rule was to protect investors against "fraud":

"During the fiscal year the Commission adopted Rule X–10B–5 as an additional protection to investors. The new rule prohibits fraud by any person in connection with the purchase of securities, while the previously existing rules against fraud in the purchase of securities applied only to brokers and dealers." 1942 Annual Report of the Securities Exchange Commission 10.

it is " 'the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.' " *Dixon* v. *United States,* 381 U. S. 68, 74 (1965), quoting *Manhattan General Equipment Co.* v. *Commissioner,* 297 U. S. 129, 134 (1936). Thus, despite the broad view of the Rule advanced by the Commission in this case, its scope cannot exceed the power granted the Commission by Congress under § 10 (b). For the reasons stated above, we think the Commission's original interpretation of Rule 10b–5 was compelled by the language and history of § 10 (b) and related sections of the Acts. See, *e. g., Gerstle* v. *Gamble-Skogmo, Inc.,* 478 F. 2d 1281, 1299 (CA2 1973); *Lanza* v. *Drexel & Co.,* 479 F. 2d 1277, 1304–1305 (CA2 1973); *SEC* v. *Texas Gulf Sulphur Co.,* 401 F. 2d, at 868 (Friendly, J., concurring); 3 Loss, *supra,* n. 17, at 1766; 6 *id.,* at 3883–3885. When a statute speaks so specifically in terms of manipulation and deception, and of implementing devices and contrivances—the commonly understood terminology of intentional wrongdoing—and when its history reflects no more expansive intent, we are quite unwilling to extend the scope of the statute to negligent conduct.[33]

---

[33] As we find the language and history of § 10 (b) dispositive of the appropriate standard of liability, there is no occasion to examine the additional considerations of "policy," set forth by the parties, that may have influenced the lawmakers in their formulation of the statute. We do note that the standard urged by respondents would significantly broaden the class of plaintiffs who may seek to impose liability upon accountants and other experts who perform services or express opinions with respect to matters under the Acts. Last Term, in *Blue Chip Stamps,* 421 U. S., at 747–748, the Court pertinently observed:

"While much of the development of the law of deceit has been the elimination of artificial barriers to recovery on just claims, we are not the first court to express concern that the inexorable broadening of the class of plaintiff who may sue in this area of the law will ulti-

## III

Recognizing that § 10 (b) and Rule 10b–5 might be held to require proof of more than negligent nonfeasance by Ernst & Ernst as a precondition to the imposition of civil liability, respondents further contend that the case should be remanded for trial under whatever standard is adopted. Throughout the lengthy history of this case respondents have proceeded on a theory of liability premised on negligence, specifically disclaiming that Ernst & Ernst had engaged in fraud or intentional misconduct.[34] In these circumstances, we think it inappropriate to remand the action for further proceedings.

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN joins, dissenting.

Once again—see *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 730 (1975)—the Court interprets

---

mately result in more harm than good. In *Ultramares Corp.* v. *Touche,* 255 N. Y. 170, 174 N. E. 441 (1931), Chief Judge Cardozo observed with respect to 'a liability in an indeterminate amount for an indeterminate time to an indeterminate class:

" 'The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences.' *Id.,* at 179–180, 174 N. E., at 444."

This case, on its facts, illustrates the extreme reach of the standard urged by respondents. As investors in transactions initiated by Nay, not First Securities, they were not foreseeable users of the financial statements prepared by Ernst & Ernst. Respondents conceded that they did not rely on either these financial statements or Ernst & Ernst's certificates of opinion. See n. 9, *supra.* The class

§ 10 (b) of the Securities Exchange Act of 1934, 15
U. S. C. § 78j (b), and the Securities and Exchange
Commission's Rule 10b–5, 17 CFR § 240.10b–5 (1975),
restrictively and narrowly and thereby stultifies recovery
for the victim.   This time the Court does so by confining
the statute and the Rule to situations where the defend-
ant has "scienter," that is, the "intent to deceive, manipu-
late, or defraud."   Sheer negligence, the Court says, is
not within the reach of the statute and the Rule, and
was not contemplated when the great reforms of 1933,
1934, and 1942 were effectuated by Congress and the
Commission.

Perhaps the Court is right, but I doubt it.   The Gov-
ernment and the Commission doubt it too, as is evidenced
by the thrust of the brief filed by the Solicitor General on
behalf of the Commission as *amicus curiae*.   The Court's
opinion, to be sure, has a certain technical con-
sistency about it.   It seems to me, however, that an in-
vestor can be victimized just as much by negligent con-
duct as by positive deception, and that it is not logical
to drive a wedge between the two, saying that Congress
clearly intended the one but certainly not the other.

No one questions the fact that the respondents here
were the victims of an intentional securities fraud prac-
ticed by Leston B. Nay.   What is at issue, of course, is
the petitioner accountant firm's involvement and that
firm's responsibility under Rule 10b–5.   The language of
the Rule, making it unlawful for any person "in connec-
tion with the purchase or sale of any security"

"(b) To make any untrue statement of a material

of persons eligible to benefit from such a standard, though small in
this case, could be numbered in the thousands in other cases.   Ac-
ceptance of respondents' view would extend to new frontiers the
"hazards" of rendering expert advice under the Acts, raising serious
policy questions not yet addressed by Congress.

[34] See 503 F. 2d, at 1104, 1119; n. 5, *supra*.

fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,"

seems to me, clearly and succinctly, to prohibit negligent as well as intentional conduct of the kind proscribed, to extend beyond common-law fraud, and to apply to negligent omission and commission. This is consistent with Congress' intent, repeatedly recognized by the Court, that securities legislation enacted for the purpose of avoiding frauds be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." *SEC* v. *Capital Gains Research Bureau,* 375 U. S. 180, 195 (1963); *Superintendent of Insurance* v. *Bankers Life & Cas. Co.,* 404 U. S. 6, 12 (1971); *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128, 151 (1972).

On motion for summary judgment, therefore, the respondents' allegations, in my view, were sufficient, and the District Court's dismissal of the action was improper to the extent that the dismissal rested on the proposition that suit could not be maintained under § 10 (b) and Rule 10b-5 for mere negligence. The opposite appears to be true, at least in the Second Circuit, with respect to suits by the SEC to enjoin a violation of the Rule. *SEC* v. *Management Dynamics, Inc.,* 515 F. 2d 801 (1975); *SEC* v. *Spectrum, Ltd.,* 489 F. 2d 535, 541 (1973); *SEC* v. *Texas Gulf Sulphur Co.,* 401 F. 2d 833, 854–855 (1968), cert. denied *sub nom. Coates* v. *SEC,* 394 U. S. 976 (1969). I see no real distinction between that situation and this one, for surely the question whether negligent conduct violates the Rule should not depend upon the plaintiff's identity. If negligence is a violation factor

when the SEC sues, it must be a violation factor when a private party sues. And, in its present posture, this case is concerned with the issue of violation, not with the secondary issue of a private party's judicially created entitlement to damages or other specific relief. See *Rondeau* v. *Mosinee Paper Corp.*, 422 U. S. 49 (1975).

The critical importance of the auditing accountant's role in insuring full disclosure cannot be overestimated. The SEC has emphasized that in certifying statements the accountant's duty "is to safeguard the public interest, not that of his client." *In re Touche, Niven, Bailey & Smart*, 37 S. E. C. 629, 670–671 (1957). "In our complex society the accountant's certificate and the lawyer's opinion can be instruments for inflicting pecuniary loss more potent than the chisel or the crowbar." *United States* v. *Benjamin*, 328 F. 2d 854, 863 (CA2), cert. denied *sub nom. Howard* v. *United States*, 377 U. S. 953 (1964). In this light, the initial inquiry into whether Ernst & Ernst's preparation and certification of the financial statements of First Securities Company of Chicago were negligent, because of the failure to perceive Nay's extraordinary mail rule, and in other alleged respects, and thus whether Rule 10b–5 was violated, should not be thwarted.

But the Court today decides that it is to be thwarted, and so once again it rests with Congress to rephrase and to re-enact, if investor victims, such as these, are ever to have relief under the federal securities laws that I thought had been enacted for their broad, needed, and deserving benefit.*

---

*The Court, understandably, does not resolve a number of other issues suggested by the briefs. See *ante,* at 191–192, n. 7; 193 n. 11; 194 n. 12; 194 n. 13; and 214–216, n. 33. In view of the result reached by the Court, no purpose would be served by my considering those issues in dissent.