Ralph FALLS, Jr., Plaintiff-Appellant,

v.

William FICKLING, William Fickling, Jr. and F. Kennedy Hall, Defendants-Appellees.

No. 78–2119.

United States Court of Appeals, Fifth Circuit.

July 25, 1980.

Charles M. Kidd, John A. Pickens, Atlanta, Ga., for plaintiff-appellant.

Franklin R. Nix, Atlanta, Ga., for defendants-appellees.

Before GOLDBERG, FRANK M. JOHNSON, Jr., and HATCHETT, Circuit Judges.

GOLDBERG, Senior Circuit Judge:

We are today asked to decide whether a stockholder whose stock is purchased at a sheriff's sale is entitled to the protection of Rule 10b–5. For the purpose of ruling on this appeal from a dismissal for lack of standing and for failure to state a claim upon which relief can be granted, we accept the facts alleged by plaintiff to be true.

## I.

Plaintiff-Appellant, Ralph Falls, Jr., owned stock in Charter Medical Corporation, a Delaware corporation engaged in the operation of hospitals.[1] Defendants-Appellees are William Fickling, a stockholder and director of Charter Medical Corporation; William Fickling, Jr., President, Chairman of the Board, and the largest stockholder of Charter Medical Corporation; and F. Kennedy Hall, the Ficklings' attorney in the transactions at issue in this lawsuit.

The transaction directly at issue here originated in an earlier suit in a Georgia state court on two promissory notes executed by Falls to the Ficklings. As security for those notes, Falls had pledged 10,726 shares of his stock in Charter Medical Corporation. These shares were held by the state court clerk from December 6, 1974, when they were deposited by Falls, until October 1976.[2] On October 14, 1976, after a jury trial, a judgment in the amount of $89,567.19 was entered against Falls. On October 25, a writ of fieri facias was issued by the court clerk to the sheriff, who levied upon the stock certificate and set December 7, 1976 as the date for the sheriff's sale.

Between October and December, the parties engaged in negotiations to settle their

---

1. The stock of Charter Medical is listed on the American Stock Exchange.

2. During this time, plaintiff was the record title holder of these shares of stock and voted them.

legal disputes.[3] However, they were unable to reach an agreement. On December 6, 1976, Falls traveled to Macon, Georgia, the site of the sheriff's sale, to ensure that the shares would sell for a fair price. For this purpose, he had with him a certified check for $100,000, which he exchanged in Macon for three smaller checks. If necessary, he planned to use one of these to purchase the shares.

The parties continued to negotiate on December 7, the date set for the sale. The Ficklings offered to bid $4.00 per share at the sale, an offer which Falls rejected. When the Ficklings raised their offer to $4.50,[4] Falls accepted, and a settlement agreement was executed.

The settlement agreement provided that the Ficklings would bid $4.50 per share at the sheriff's sale, for a total bid of $48,267.00. An additional $25,000 which belonged to Falls but was being held by the court in another action would be paid to the Ficklings. Falls would pay the Ficklings an additional $17,449.14 in cash.[5] The parties released each other of all claims arising from acts prior to the execution of the agreement and agreed to dismiss with prejudice all pending litigation between the parties. The Falls[6] specifically consented to the sheriff's sale and agreed to execute any documents necessary to effect the transfer at the sale. The sheriff's sale was conducted according to plan, and the stock was transferred to the Ficklings.

During the week immediately preceding December 7, the stock of Charter Medical traded on the American Stock Exchange at a high of $4.00 per share. On December 9, 1976, two days after the sheriff's sale, Charter Medical announced an exchange offer for a maximum of 500,000 shares of common stock, twenty-five percent of the outstanding shares. The offer provided that each share of common[7] could be exchanged for a share of a new preferred stock, which would have a liquidation preference of $7.00 and a cumulative annual dividend of $0.75.

Falls had no knowledge of the exchange offer prior to December 9 or 10, when he was informed of it by his stockbroker. The Ficklings, he alleges, knew or should have known of the impending offering prior to December 7. An offering circular describing the offering was mailed to stockholders on approximately December 28, 1976. The price of the common on the American Stock Exchange had risen to $7.00 per share by December 31, 1976.

Falls' complaint alleges that the appellees' failure to disclose the impending exchange offer during the negotiations which culminated in the settlement agreement constituted a fraud and deceit upon Falls, in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission promulgated thereunder, 17 C.F.R. § 240.10b–5 (1979). He seeks $3.00 per share in damages, equal to the difference between the $4.00 of the per share price bid at the sale representing the value of the stock itself[8] and the market value on December 31, 1976 of $7.00, which allegedly reflected the value of the stock given the existence of the exchange offer.

The court below dismissed Falls' complaint for failure to state a claim upon

---

3. Besides the action on the promissory notes, there were several other lawsuits pending in which the parties were involved.

4. It is alleged that the price of $4.50 per share included approximately $0.50 per share in consideration for Falls' agreement to dismiss several lawsuits pending against the Ficklings.

5. The sum of these amounts, $90,716.14, was the total amount of the judgment against Falls plus interest and costs.

6. Appellant's father, Ralph Falls, had accompanied appellant on the trip to Macon and joined in the settlement agreement.

7. The common stock had a par value of $0.25. No dividends had ever been paid on the common.

8. See n. 4 *supra*.

which relief can be granted. It relied on *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), which held that only purchasers and sellers of securities have standing to bring private damage actions under Rule 10b–5. The court held that Falls was not a seller of the stock because the sheriff conducted the sale by virtue of court process and the plaintiff lacked power to prevent the sale. The court also held that Falls was not a purchaser, but rather a disappointed non-purchaser, a class of plaintiffs denied standing by *Blue Chip Stamps, supra.* Thus, the court held that Falls lacks standing to maintain this action. Further, the court held that any losses suffered by Falls "were not occasioned by the non-disclosure of purported inside information, but rather by the Sheriff's levy and sale of the stock to satisfy the outstanding judgment against [Falls]."

## II.

This Court has held that

there are three basic elements . . . in 10b–5 actions: (1) conduct by the defendants proscribed by the rule; (2) a purchase or sale of securities by the plaintiffs "in connection with" such proscribed conduct; and (3) resultant damages to the plaintiffs.

9. In this circuit, the test of materiality is "whether a reasonable man would attach importance to the fact misrepresented in determining his course of action." *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 603–04 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974). *Cf. TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (materiality for purposes of Rule 14a–9, 17 C.F.R. § 240.-14a–9 (1979)). There can be no question that, but for the unusual circumstances surrounding the transaction in question here, the information not disclosed would have affected the decision of a reasonable shareholder contemplating the sale of Charter Medical stock.

10. This allegation satisfies the scienter requirement established by *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1978).

*Sargent v. Genesco, Inc.,* 492 F.2d 750, 759 (5th Cir. 1974) (footnote omitted); *see Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 93 (5th Cir. 1975).

Appellees here do not seriously dispute that their conduct as alleged by appellant was proscribed by the rule. The alleged conduct was manifestly "some sort of fraud, in the special 10b–5 sense of the word," *Woodward, supra,* 522 F.2d at 93, since the appellees bid for and purchased stock, while in the possession of material [9] inside information, "as part of [a] scheme to defraud [appellant]." [10] Plaintiff's Amended Complaint, Record at 105.

There can be little question that there was a sale of securities by appellant that accompanied appellees' conduct. Although the court below held that a "forced sale" over which a plaintiff has no control is not a "sale" for the purpose of Rule 10b–5, appellees, recognizing that "forced sellers" are nonetheless "sellers" under the rule,[11] have all but conceded this issue on appeal. Moreover, unlike the traditional "forced seller" plaintiff who does not actually sell his shares, *see, e. g., Vine v. Beneficial Finance Co.,* 374 F.2d 627 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), appellant here did sell his shares to appellees.[12] *See Bosse v. Crowell, Collier and MacMillan,* 565 F.2d 602

11. The continued vitality of the "forced seller" doctrine after the decision of the United States Supreme Court in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) was recently acknowledged in *Alley v. Miramon,* 614 F.2d 1372, 1384–87 (5th Cir. 1980).

12. Under Georgia law, "a sheriff in making a sale is the agent of and acts for the defendant in [fieri facias]," *Dupriest v. Bennett Bros.,* 61 Ga.App. 704, 7 S.E.2d 293 (1940), and the proceeds of a sheriff's sale belong to the defendant in fieri facias. *See Lowe v. Rawlins,* 83 Ga. 320, 10 S.E. 204 (1889). If a transaction is a "sale" under state law, we see no reason to adopt a more restrictive test under Rule 10b–5. *See generally Alley v. Miramon,* 614 F.2d 1372, 1381 n.18, 1382 n.21 (5th Cir. 1980).

Because appellant was an actual seller of securities, we need not reach his alternate con-

(9th Cir. 1977); *cf. Cambridge Capital Corp. v. Northwestern National Bank of Minneapolis*, 350 F.Supp. 829 (D.Minn.1972) (creditor which held secondary lien on stock sold at sheriff's sale held to be "seller").

■ There can also be little dispute, taking the allegations of appellant's complaint as true, that he was damaged by the transaction at issue here. He received approximately $4.00 per share for stock which the market valued at approximately $7.00 shortly after the exchange offer was disclosed. As appellees recognize on this appeal, the fact that appellant was powerless to prevent the sheriff from conducting the sale is properly related to the issue of the "causal nexus between the defendant's wrongful conduct and . . . (the plaintiff's) loss." *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith*, 562 F.2d 1040, 1048 (8th Cir. 1977). To that issue we now turn.

### III.

■ Appellees rely heavily on the analysis of causal nexus contained in the Eighth Circuit's opinion in *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith*, 562 F.2d 1040 (8th Cir. 1977). That case involved a sale of stock pursuant to a stock option agreement. When Merrill Lynch changed its form from a partnership to a corporation, the stock issued the former partners was subject to certain transfer restrictions, including an option of Merrill Lynch to purchase the holder's stock at adjusted net book value upon the holder's death. A former partner died in late 1970, and Merrill Lynch exercised its option to purchase his stock at its net book value of approximately $27 per share. In early 1971, Merrill Lynch went public, and its shares were offered to the public at a price approximately three times that received by the executors of the estate of the former partner. In their complaint, the plaintiffs alleged that the stock was purchased in furtherance of a fraudulent scheme by Merrill Lynch management to enhance the public offering price and retain control of company management after the public offering.

In reversing a verdict for plaintiff after a bench trial, the Eighth Circuit held that: [C]ausation in fact does not exist as a matter of law under . . . Rule 10b–5. Any "loss" which was occasioned by the sale of the . . . stock to the corporation was not caused by any material omission, fraudulent or otherwise, on the part of the defendants. The purported "loss" was caused by two events unrelated to the alleged fraud: (1) the execution of the stock restriction . . . and (2) the death of the [Merrill Lynch partner], the specified contingency which triggered the operation of the stock restriction. Whatever the [deceased partner's] executors knew or did not know about a future public offering of Merrill Lynch stock was wholly irrelevant to their decision to sell the stock. After [the Merrill Lynch partner] died . ., the decision to sell was out of their hands; they were contractually bound to sell under [the stock option agreement] if Merrill Lynch exercised its option. Any information concerning the public offering was not "material" in the sense that a reasonable or objective investor, in the plaintiffs' circumstances, would likely have considered it important in making his decision to sell. Likewise, in reliance terms, any information concerning the public offering could not have subjectively influenced the plaintiffs to act differently than they did act in selling the shares to the corporation pursuant to the terms of the stock restriction. The defendants were thus under no obligation— and had no federal "duty" under § 10(b) and Rule 10b–5,—to disclose any information to the plaintiffs concerning the public offering when the stock restriction was enforced.

*Id.* at 1049–50 (footnotes omitted).

Appellees claim that this causation analysis "applies with equal force to the forced

---

tention that the settlement agreement signed by the parties was a "contract to sell" the stock

and therefore satisfied the statutory definition of a "sale." *See* 15 U.S.C. § 78c(a)(14).

sale circumstances involved in this appeal." Brief of Appellees at 14. Like the situation in *Merrill Lynch*, appellees assert, "[a]ny information concerning Charter Medical's subsequent exchange offering was not material in the sense that the sale of the stock was not subject to [appellant's] decision, irrespective of whether he would have considered information regarding the exchange offering important." *Id.* at 15. The argument continues, "[l]ikewise, in reliance terms, any information concerning the exchange offering could not subjectively have [appellant] to act differently than he did in the sheriff's sale, *except* to the extent that he might have decided to purchase the stock for himself." *Id.*

The simple fallacy in this argument is made clear by the difference noted by appellees themselves: that appellant might have decided to purchase the stock for himself. Appellant alleged that he would not have sold his stock at the sheriff's sale if he had known of the impending exchange offer. Record at 107. Although he might have been unable to prevent the sheriff from proceeding with the sale, he could have entered a protective bid for the stock and thus retained its ownership or ensured that he received its fair value in exchange.

In *Merrill Lynch*, the fact that there was *nothing* that plaintiff there could have done to prevent Merrill Lynch from purchasing the stock at the price established by a formula set long before was important to the court:

The plaintiffs have not suggested how they might have acted differently had

they been given prior notice of any company preparations to go public, aside from the observation that they would have taken every possible legal action to protect their interests. However, plaintiffs could have litigated nothing more at that time than they have litigated in this case. The point we wish to emphasize is that plaintiffs could have done nothing to block the sale of the stock.

*Merrill Lynch, supra,* 562 F.2d at 1050 n.15 (citation omitted).[13] Thus, the plaintiff in *Merill Lynch* had no control over either the occurrence of the sale *or* the price to be received at the sale. In the instant case, although the fact of the sale may have been beyond appellant's power to change, he unquestionably might have affected its price.

There is another fallacy in appellees' analogy, made evident if we consider what would have occurred if, prior to the challenged transactions, the defendants in each case had publicly disclosed all the information the respective plaintiffs claim they unlawfully failed to disclose. In *Merrill Lynch*, the insiders who were planning to go public could have announced to all the world that a public offering was imminent. They could then have proceeded to exercise the option to purchase the deceased partner's stock at the price determined by the option agreement. The plaintiffs would have received not a dollar more than they actually received.[14] Here, in contrast, a public announcement prior to the sheriff's sale that an exchange offer valued at approximately $7.00 per share of Charter Medical was in the works would almost

**13.** *Compare Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 474, 97 S.Ct. 1292, 1301 n.14, 51 L.Ed.2d 480 (1977) (alleged nondisclosure not material because plaintiffs did not indicate how they might have behaved differently had all information been disclosed) *with Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Insurance Co.,* 606 F.2d 602, 614 (5th Cir. 1979) (deception held material where plaintiff had reasonable basis for state law suit to stop defendants' purchases).

**14.** Put otherwise, this analysis demonstrates that plaintiffs in *Merrill Lynch* were not truly relying on a non-disclosure or misrepresenta-

tion theory, but were attempting to establish a federal duty, imposed by Rule 10b–5, obligating controlling insiders to renegotiate or refrain from exercising otherwise valid stock option agreements when the insiders are aware that the option price does not reflect the stock's true value. The Eighth Circuit held that rule 10b–5 creates no such duty. *Cf. Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (mere breach of fiduciary duty by majority stockholders does not violate Rule 10b–5).

inevitably have increased the amount received by appellant to approximately $7.00 per share, regardless of appellant's actions, because anyone aware of the sheriff's sale could have made a profit if he was able to buy the stock at a discount from its fair value. Appellant is entitled to attempt to prove that he would have received more than he actually received.

Appellant relies on, and appellees attempt to distinguish, *Cambridge Capital Corp. v. Northwestern National Bank of Minneapolis*, 350 F.Supp. 829 (D.Minn.1972). Plaintiff had sold certain shares to a third party, who pledged most of the shares to a bank as collateral for a loan. The buyer also executed a promissory note to plaintiff in partial payment of the purchase price, and secured the promissory note by a pledge to plaintiff of the same shares pledged to the bank. Plaintiff's security interest in the shares was subordinate to that of the bank. After the buyer's default, the bank forced a sale of the pledged shares at a sheriff's sale. The proceeds were sufficient to satisfy the buyer's indebtedness to the bank, but left plaintiff unsatisfied.

In its complaint, plaintiff alleged that the failure of the purchasers at the sheriff's sale to disclose all material information had the effect of decreasing the amount received at the sale below the fair value of the pledged shares sold. The court denied defendants' motion to dismiss for failure to state a claim upon which relief can be granted, holding that plaintiff, as well as the bank with the senior security interest, was a seller for purposes of the standing requirement of Rule 10b–5.

Precisely the same situation was present in *Cambridge Capital* as is present here, whether it be labeled a difficulty with "causal nexus," "reliance," or "materiality." Plaintiff there "faced a judicial sale of the subject stock whether he liked it or not. Any [misrepresentations or non-disclosures were] not material in the sense that the sale of the stock was not subject to the Plaintiff's decision, irrespective of whether he would have considered [the] information . . . important. Likewise, in reliance terms [the] information . . . could not subjectively have influenced the Plaintiff to act differently than he did in the sheriff's sale, *except* to the extent that he might have decided to purchase the stock for himself." Brief of Appellee at 15 (emphasis in original). Appellees tell us, however, that "there was no causation problem in *Cambridge Capital*, because the material omissions alleged therein had the effect of reducing the price brought by the stock *below* its fair market value, [whereas here] the stock sold unquestionably brought its fair market value on the day of the sheriff's sale." *Id.* at 17.

■ We fail to understand what this distinction between the two cases has to do with appellees' contention that there was no causal connection between appellees' non-disclosure and appellant's damages because appellant could not prevent the sheriff's sale.[15] Moreover, we note that if $4.00 or $4.50 per share was the "fair market value" of the stock on the date of the sheriff's sale, appellees have nothing to fear because appellant will be unable to prove any dam-

---

15. Appellees also attempt to distinguish *Cambridge Capital* on the ground that it preceded *Blue Chip Stamps* "so that the speculative aspects of the junior creditor's non-purchase of stock at the sheriff's sale was not at that time a relevant consideration for the court." Brief for Appellees at 17. Although the Supreme Court's adoption of the "purchaser-seller" requirement was justified largely by fears concerning speculative elements of proof, we do not understand it to preclude a defrauded seller from proving a security's fair market value on the date of his sale by evidence of its market value shortly after the alleged misrepresentations or nondisclosures have been rectified. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972); *Dupuy v. Dupuy*, 551 F.2d 1005, 1024–25 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); *cf. Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.), *cert. denied*, 86 S.Ct. 163, 382 U.S. 879, 15 L.Ed.2d 120 (1965) (even unforeseeable, speculative profits must be disgorged by wrongdoer to defrauded seller).

ages. It is true that the stock was trading publicly at this price at the time of the sheriff's sale. But appellees' implicit assertion that a stock's price on the public markets conclusively establishes its fair market value is patently false. *See, e. g., Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Insurance Co.*, 606 F.2d 602, 615 (5th Cir. 1979). Were it true, any insider, possessing undisclosed material information, could trade at will on the public stock exchanges without fear of 10b–5 liability.

*Mount Clemens Industries, Inc. v. Bell*, 464 F.2d 339 (9th Cir. 1972) supports in dictum the conclusion that parties who sell at sheriff's sales are not precluded from recovering under Rule 10b–5 because any misrepresentations or omissions could not affect their decision to sell. Holding that parties allegedly induced by misrepresentations not to bid at a sheriff's sale lack standing under Rule 10b–5, the Ninth Circuit stated "[i]t is . . . clear that if the alleged misrepresentation had the effect of decreasing the amount [the seller] received for the [shares sold at the sheriff's sale], [the seller] . . . might state a valid federal claim against the perpetrators of the fraud." *Id.* at 347 n.14.

The Second Circuit has also adopted this view:

> [R]eliance is an element of causation which plays little role in nondisclosure cases. . . . "[T]he test of 'reliance' is whether 'the misrepresentation is a substantial factor in determining the course of conduct which results in [the plaintiff's] loss' . . . ." [citation omitted] . . . [W]here the success of a fraud does not require an exercise of volition by the plaintiff, but instead requires an exercise of volition by other persons, there need be no showing that the plaintiff himself relied upon the deception. "What must be shown is that there was deception which misled [other] stockholders and that this was in fact the cause of plaintiff's claimed injury." [citation omitted]

*Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 797 (2d Cir. 1969), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970).[16] *See generally Rifkin v. Crow*, 574 F.2d 256, 261–63 (5th Cir. 1978).

### IV.

Appellees ask us to dissect appellant into two distinct actors—a forced seller and a disappointed non-purchaser—and then to hold that 1) neither of appellant's halves considered independently would have a cause of action under § 10(b), and therefore 2) appellant must not have a cause of action. The argument runs as follows: As a seller, appellant's alleged damages were not caused by appellees' actions because appellant would have been unable to do anything to stop the sale except himself bid at the sale. Since appellant did not bid at the sale, he "relied" on appellees only as a disappointed non-purchaser. As a disappointed non-purchaser, he lacks standing under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).[17]

Even if we agreed that appellant's "seller" half suffered damage only because he

---

**16.** Of course, appellant also alleges that he was damaged because he, as well as other potential bidders at the sheriff's sale, would have acted differently but for appellees' "deception."

**17.** *Blue Chip Stamps* involved an attempt to invoke the protection of Rule 10b–5 by non-purchasing offerees of a stock offering carried out pursuant to an antitrust consent decree. The plaintiff, Manor Drug Stores, alleged that the prospectus prepared and distributed by Blue Chip in connection with the offering was materially misleading in its overly pessimistic appraisal of Blue Chip's status and future prospects; that Blue Chip had intentionally made the prospectus overly pessimistic in order to discourage offerees from accepting what was intended to be a bargain offer, so that the rejected shares might later be offered to the public at a higher price; and that Manor Drug and other offerees had failed to purchase the offered securities because of and in reliance on the false and misleading prospectus. *Blue Chip Stamps, supra*, 421 U.S. at 726–27, 95 S.Ct. at 1920. The Supreme Court held that the plaintiff class for purposes of section 10(b) and Rule

declined to bid,[18] we would still reject this suggested bifurcation as completely unrealistic. It asks us to ignore that appellant was a "seller" who also alleges that he was ready, willing, and able to bid himself.[19] *Blue Chip Stamps* does not command that we ignore this reality; rather, it holds that parties who are *neither* buyers nor sellers of securities cannot bring suit under Rule 10b–5. Appellant here sold his stock.[20] Therefore, he has standing as a seller under Rule 10b–5.

Appellees suggest that the Supreme Court's concerns about speculative elements of proof, as expressed in *Blue Chip Stamps*, counsel us to affirm the dismissal of this action. We recognize, as has the Supreme Court, *see Blue Chip Stamps*, 421 U.S. at 734, 95 S.Ct. at 1925, that "the damages suffered by purchasers and sellers . . . may on occasion be difficult to ascertain." *Id.*[21] But the Supreme Court was concerned about the likelihood that a limitless class of plaintiffs who had never dealt in a security might allege that, but for a defendant's misrepresentations, they would have purchased large quantities of the stock. *See id.* at 734–35, 95 S.Ct. at 1924. Moreover, the claim would turn on uncorroborated oral testimony, *see id.* at 746, 95 S.Ct. at 1930, which would make the suit "virtually impossible to dispose of prior to trial other than by settlement." *Id.* at 742, 95 S.Ct. at 1928.

Here, in contrast, we have an "objectively demonstrable fact," *id.* at 747, 95 S.Ct. at 1931, of the type required by the rule—to wit, a sale of securities. Unlike in *Blue Chips Stamps*, we have a fixed number of sales on which to base the calculation of appellant's damages. *See id.* at 734–35, 95 S.Ct. at 1924–25. Thus, the instant transaction falls without both the letter and the spirit of the *Blue Chip Stamps* doctrine.

## V.

The fundamental purpose of the Securities Exchange Act of 1934 is "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor.*" *Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977). Congress meant to enable buyers and sellers of securities to make a proper appraisal of their value. *Herpich v. Wallace*, 430 F.2d 792 (5th Cir. 1970). Rule 10b–5 is a major part of the structure enforcing full disclosure. Close to the rule's heart lies the situation in which corporate insiders take advantage of their superior knowledge to profit at the expense of other shareholders by trading in the corporation's stock. *See, e. g., Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890 (2d Cir. 1972); *Kohler v. Kohler Co.*, 319 F.2d 634, 637 (7th Cir. 1963); *Speed v. Transamerica Corp.*, 99 F.Supp. 808, 829 (D.Del.1951).

The facts alleged here present a classic 10b–5 case: corporate insiders who know that the stock is more valuable than its market price and that its market price will soon increase when facts in their possession are disclosed negotiate face-to-face with a party lacking this knowledge and arrange to buy the stock at the unfairly low market price.[22] If appellant's allegations are true, appellees could not have bought Charter

---

10b–5 private damage actions is limited to purchasers and sellers of securities.

**18.** As noted above, appellant, considered merely as a seller and not as a potential bidder at the sheriff's sale, also suffered damage because the amount received was less than the fair value of the stock.

**19.** His affidavit states that he had a certified check with him which he intended to use to purchase the shares or ensure that they sold at a fair price. Record at 224.

**20.** See p. 7, *supra*.

**21.** It should be noted that the situation we have here—a sale of a number of shares whose value rises shortly thereafter due to a discrete event—is among the least speculative types of transactions for damage calculation.

**22.** As the Second Circuit has said:

The essence of the Rule is that anyone who, trading for his own account in the securities of a corporation has "access, directly or indirectly, to information intended to be

Medical stock from any other stockholder on the date they purchased it from him, nor could they have bought it on a stock exchange, without subjecting themselves to 10b–5 liability. Under appellees' theory, however, they were free to purchase appellant's stock and profit from their inside information because the stock was being sold at a sheriff's sale rather than through the stock exchanges. We find no merit in their theory, and accordingly reverse and remand for further proceedings consistent with this opinion.

REVERSED and REMANDED.

available only for a corporate purpose and not for the personal benefit of anyone" may not take "advantage of such information knowing it is unavailable to those with whom he is dealing," . . . [A]nyone in possession of material inside information must either disclose it to the investing public, or . . . must abstain from trading in . . the securities concerned while such information remains undisclosed.
*S. E. C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968).