SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Joseph C. FOX, David L. Ball, Patricia
J. Randall and Carl J. Fleece,
Defendants.

Civ. A. No. CA–5–84–172.

United States District Court,
N.D. Texas,
Lubbock Division.

Oct. 14, 1986.

Order Oct. 16, 1986.

Bernard John Barrett, Jr., Jay B. Dorsey, Lester Green, Therese D. Pritchard, Paul A. Fischer, Richard J. Sheehan, John H. Sturc, Teresa A. Koncick, Div. of Enforcement, S.E.C., Washington, D.C., Hugh Wright, Asst. Regional Adm'r, S.E.C., Fort Worth, Tex., Paul Gonson, Solicitor, Richard M. Humes, Asst. Gen. Counsel, James A. Brigagliano, Atty., S.E.C., Washington, D.C., for plaintiff.

Robert F. Watson, Jonathan G. Kerr, H. Allen Pennington, Jr., Robert W. Blair, Law, Snakard, Brown & Gambill, Fort Worth, Tex., for defendant Joseph C. Fox.

William G. Line, Kerrigan, Line & Martin, Fremont, Neb., for defendant David L. Ball.

James L. Truitt, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for defendants Patricia J. Randall and David L. Ball.

Brad Crawford, Jr., Crenshaw, Dupree & Milam, Lubbock, Tex., for defendant Carl J. Fleece.

## MEMORANDUM

WOODWARD, Chief Judge.

On October 1, 1984, the plaintiff filed its complaint in this case alleging that the defendants had violated and would continue to violate Section 10(b) of the Securities Exchange Act of 1934 (hereafter Exchange Act), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.-10b–5. Plaintiff brings this action pursuant to Sections 21(d) and (e) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u(e), to restrain and enjoin defendants from engaging in the transactions complained of and for other equitable relief. This court has jurisdiction pursuant to Sections 21 and 27 of the Exchange Act, 15 U.S.C. §§ 78u and 78aa.

This case involves the defendants' purchase and sale of puts or options contracts for the sale of TI common stock. The plaintiff alleges that the defendants, while employed by TI, traded on material, nonpublic information prior to TI's public announcement on June 10, 1983, of a forthcoming loss of approximately $100 million. Plaintiff further alleges that the defendants, directly and indirectly, used interstate commerce, the United States mail, and the facilities of the national securities exchanges in their transactions.

The above case was tried before the court, without a jury, from June 23 to June 26, 1986, and was completed on June 28, 1986. The plaintiff, the defendants, and their attorneys were present and announced ready for trial.

After hearing and considering the pleadings and evidence in this case, the court files this memorandum which shall constitute this court's findings of fact and conclusions of law.

## I. *The Parties*

The plaintiff in this action is the Securities and Exchange Commission (hereafter SEC).

There are four defendants in this action: Joseph C. Fox, David L. Ball, Patricia Joanne Randall Ball (hereafter Joanne Ball), and Carl J. Fleece. At the time this suit arose in 1983, all the defendants were employed by Texas Instruments, Inc. (hereafter TI), in Lubbock, Texas:

(1) Defendant Joseph C. Fox is currently employed by TI. He began working for TI in March, 1970.

(2) Defendant David L. Ball was formerly employed by TI for approximately ten years, from 1973 to 1983. Mr. Ball now lives in Singapore and is married to defendant Joanne Ball. During 1983, they were dating.

(3) Defendant Joanne Ball was formerly employed by TI for approximately four years, from 1979 to 1983. Mrs. Ball lives in Singapore with her husband.

(4) Defendant Carl J. Fleece is currently employed by TI. He began working for TI in 1970. Mr. Fleece now lives in Georgetown, Texas, and is the Branch Purchasing Manager in the Data Systems Group at TI in Austin, Texas.

## II. *The Facts*

The facts are uncontroverted in this case; plaintiff's cause of action arose in 1983.

Texas Instruments is a Delaware corporation with its headquarters in Dallas, Texas. The corporation develops, manufactures, and sells electronic products for consumer and government markets. In 1982, TI had net sales of $4,327 million, a net income of $144 million, and earnings per share of $6.10 based on 23,652,416 shares outstanding. TI common stock was registered with the SEC pursuant to Section 12(b) of the Exchange Act, 15 U.S.C. § 78*l* (b), and was listed for trading on the NYSE.

### A. *The Consumer Group*

In 1983, TI was organized into five separate business groups, one of which was the Consumer Products Group (hereafter Consumer Group). This group was responsible for producing TI's home computer, the TI 99/4A, and related products. The Consumer Group was headquartered in Lubbock and consisted of seven divisions: Marketing, Software, Home Computer, Educational Products, Quality Control, Operations, and Control. The group contributed 7% of TI's 1982 net earnings.

From at least May through October of 1983, TI's consumer business was directed by the Consumer Group in Lubbock. All the defendants worked in the Consumer Group and held the following positions during 1983:

(1) Defendant Fox was a Division Manager of the Operations Division of the Consumer Group. The Operations Division was responsible for industrial engineering and international support activities. Mr. Fox supervised approximately forty employees, one of whom was defendant David Ball.

(2) Defendant David Ball was the International Support Manager in the Operations Division of the Consumer Group during May and June of 1983. Mr. Ball was responsible for the planning and shipping of part and finished TI components to various overseas locations.

(3) Defendant Joanne Ball was the Strategic Planning Manager in the Control Division of the Consumer Group during May and June of 1983. Mrs. Ball was responsible for analyzing the Consumer Group markets, and performing strategic long-range planning functions. She had previously worked as a financial analyst in the Control and Home Computer Divisions of the Consumer Group, and as a controller in the Educational Products Division of the Consumer Group.

(4) Defendant Fleece was the Purchasing Manager in the Operations Division of the Consumer Group.

On or before June 4, 1983, defendants Fox, D. Ball, and J. Ball attended a Consumers Electronics Show in Chicago, Illinois. Various marketing and operational employees of TI attended. Defendant Fleece did not attend.

In 1983, the basis for management and operation decisions in the Consumer Group, and TI's other operating groups, was the annual forecast. For the Consumer Group, this plan was a projection of the group's level of production, estimated sales, and anticipated profits. It also contained the production levels necessary to support predicted sales. Once developed, the annual forecast was submitted for review to TI's corporate management and directors. When accepted or modified, the forecast served as the operational plan for the Consumer Group. The management then consolidated each group's annual plan into a TI corporate forecast.

The Consumer Group reevaluated its annual forecast on a monthly basis, called the monthly forecast process. This process included the preparation of a manufacturing requirements schedule (hereafter MRS) by the operation's manager in charge of procurement and production for each operating division. The MRS established the production levels necessary to support the sales projections contained in the annual forecast. The monthly forecast was then sent to top management and TI's directors for approval or modification. Once accepted, the monthly forecast continued or amended the annual forecast. Therefore, the annual plan was reviewed each month.

It was the Consumer Group's practice to formulate its annual forecast in the last quarter of the previous year. Thus, the group's 1983 forecast was prepared in 1982. For 1983, the annual forecast for home computers and software predicted sales of 3 million consoles and 19.2 million units of software. These estimates were accepted by TI's corporate management and directors.

From January 1, 1983, until June 10, 1983, neither the annual forecast nor the monthly forecasts, as submitted by the Consumer Group and accepted, ever varied below the annual forecasted sales of 3 million consoles and 19.2 software units. Indeed, the April and May monthly forecasts altered the plan for 3.4 million console sales. The Consumer Group's monthly forecast for June continued the annual plan for 3 million consoles.

Inherent in TI's management process was the use of analyses called "what ifs." A "what if" was a routine management tool used to define what might happen under an assumed set of circumstances. The "what if" was not a plan, goal, or forecast. Furthermore, no business commitments or manufacturing schedules were based on the "what if." During the period at issue in this suit, the Consumer Group generated several "what ifs" evaluating the impact of different levels of home computer production for 1983. Some of the "what ifs" produced during May through June 10, 1983, considered levels of home computer production lower than the annual plan's 3 million figure.

B. *Events Preceding TI's June 10, 1983 Announcement*

On June 10, 1983, TI's Board of Directors held a special meeting and issued a press release after the close of public trading on the New York Stock Exchange and Chicago Board Options Exchange. TI announced that it was reducing production of its home computer hardware and software and was projecting an after-tax loss of approximately $100 million for the second quarter due to developments in its home computer operations.

Various factors that began in the spring of 1983 contributed to this loss. On February 22 and March 1, TI announced that there was a defect in the computer's transformer. In the latter part of May, sales of TI's home computer, software, and related products to retailers sharply fell. This reflected a large inventory buildup of TI's computer products. Other contributing factors were the "price protection on larger-than expected inventories of consoles at retailers, increased rebate reserves, and

home computer prices which declined more rapidly than cost reductions were achieved." [Plaintiff's Exhibit 2].

Prior to TI's announcement on June 10, there were various corporate activities occurring. On April 26, 1983, Mr. J. Fred Bucy, TI's President and Chief Executive Officer (hereafter CEO), visited the Consumer Group facilities in Lubbock. On June 2, 1983, Mr. Bucy assigned Mr. Robert Pearson, Vice-President of Finance, to Lubbock to assess the Consumer Group's financial reporting system, and to assist the group through the period of rapid growth in TI's home computer market projected in the annual forecast.

Also on June 2, 1983, Mr. Bucy attended a review of the Consumer Group operations in Lubbock with the group's managers. At that time, the preliminary sales projections for May were discussed, but no "what ifs" concerning alternative home computer sales volumes were presented during the meeting. At a later meeting, only Mr. Bucy, Mr. Pearson, Mr. Jerry Jenkins, Executive Vice-President for the Consumer Group, Mr. Bill Turner, President of the Consumer Group, and Mr. Jim Higdon, Manager of the Control Division of the Consumer Group, were present. During that meeting, "what ifs" evaluating lower than forecast home computer production volumes were presented and discussed. The consensus of this later meeting was that the Consumer Group should prepare a June forecast based upon projected shipments of 3 million consoles and 15 million software cartridges.

Because of the low sales results for TI's home computer in May, Mr. Mark Shepherd, Chairman of the Board of Directors, and Mr. Bucy decided on June 3 that board members should meet for a special review session the next week on June 10, 1983. With the board meeting scheduled for June 10, the monthly Consumer Group forecast review meeting was rescheduled from June 9 to June 8. The Consumer Group forecast adopted on June 8 called for a shipment of three million consoles and fifteen million software cartridges in 1983. Although no definite information was available on TI's estimated second quarter or annual earnings, Max Post, TI's manager of investor relations was instructed to prepare a draft of a press release on June 3 in case a public announcement was necessary.

During the week of June 6, 1983, a team of corporate executives in Dallas reviewed various assumed levels of TI home computer product sales for the remainder of 1983, the probability that such levels could be achieved, and the impact of such levels on corporate earnings. Some of the information used in these analyses were sent to Dallas from the Lubbock Consumer Group controllers, Mr. Jim Higdon, Mr. Sil Pena, and Mr. Charlie Bolton. On June 9 or June 10, 1983, senior corporate management rejected the recommendations of the Consumer Group forecast meeting to produce 3.4 million consoles for 1983. Instead, management decided to reduce the production plan for 1983 to 2.3 million consoles and 12 million software cartridges.

On June 10, 1983, this plan was reviewed and approved by TI's Board of Directors and was publicly announced in a press release issued that afternoon. The new production plan caused a substantial reduction in estimated corporate earnings for 1983, and resulted in a significant estimated loss of $100 million for the second quarter.

C.  *Activity of TI Stock:*

From June 6 to June 10, 1983, activity in TI's common stock was as follows:

| DATE | HIGH | LOW | CLOSE | VOL |
|------|------|-----|-------|-----|
| June | | | | |
| 6 | 169 | 162½ | 168 | 197,400 |
| 7 | 169⅜ | 166 | 166⅛ | 180,700 |
| 8 | 166 | 163¼ | 163⅜ | 196,200 |
| 9 | 164⅛ | 155 | 160 | 630,800 |
| 10 | 160½ | 157⅝ | 157¾ | 89,100 |

It is important to note that on June 9 at 10:30 A.M. Texas time, a block trade of 295,000 shares crossed the tape at 5½ points below the last trade.

As a result of the announcement made on June 10, the opening of trading in TI common stock on the NYSE was delayed by two and one-half hours on Monday, June 13, 1983. TI common stock opened at $119,

down $38.75 from the closing price of $157.75 on June 10, prior to TI's announcement. The trading volume in TI common stock rose from 89,100 shares on June 10 to 1.9 million shares on June 13 and 1.3 million on June 14. On Tuesday, June 14, 1983, TI common stock closed at a low of $107.125:

| DATE June | HIGH | LOW | CLOSE | VOLUME | CHANGE |
|-----------|------|-----|-------|--------|--------|
| 13 | 119¾ | 116½ | 118¼ | 1,908,400 | – 39½ |
| 14 | 118¾ | 107⅛ | 107⅛ | 1,302,000 | – 11⅛ |

On June 13 and 14, TI stock lost as much as $53.00 a share from the close of trading on Friday, and as much as $62.00 a share from its high at $169 ⅜ in the previous week. Plaintiff alleges that in market value, the outstanding share lost approximately $1.4 billion in a week.

## D. *The Defendants' Stock Purchases*

Prior to the June 10 announcement, the defendants purchased puts or options contracts, and sold them soon thereafter. Each defendant's purchases are described below.

### 1. *Defendant Fox*

On June 9, 1983, defendant Fox made or attempted the following stock transactions:

| SECURITY DESCRIPTION | PRICE LIMIT ORDERS | PURCHASE OR SALE | TEXAS TIME ORDER PLACED | DOLLAR AMOUNT |
|----------------------|--------------------|------------------|-------------------------|---------------|
| 44 common stock | 163⅛ | (S) | 9:57A.M. | 7,007 |
| 25-Oct 140 puts | 3¼ | (P) | 9:59A.M. | not executed |
| 50-Jul 150 puts | 1¾ | (P) | 10:04A.M. | not executed |
| 50-Jul 150 puts | 2 | (P) | 10:28A.M. | not executed |
| 100-Jul 140 puts | ¹³⁄₁₆ | (P) | 10:28A.M. | not executed |

(At 10:30 A.M. Texas time, a block of 295,000 shares crosses the tape at 5½ points below the last trade.)

| SECURITY DESCRIPTION | PRICE LIMIT ORDERS | PURCHASE OR SALE | TIME ORDER PLACED | DOLLAR AMOUNT |
|----------------------|--------------------|------------------|-------------------|---------------|
| 100-Jul 140 puts | 1 | (P) | 10:38A.M. | 10,661 |
| 100-Jul 150 puts | 2 | (P) | 11:44A.M. | not executed |
| 100-Jul 150 puts | 2⅜ | (P) | 12:04P.M. | 24,551 |

Defendant Fox invested $43,602, including transaction costs, in purchasing the puts. On June 14, 15, and 26, 1983, Mr. Fox sold the puts for a total profit of approximately $580,400.00, after transaction costs.

### 2. *Defendant David Ball*

On June 9, 1983, defendant David Ball made or attempted the following stock transactions:

| SECURITY DESCRIPTION | PRICE ORDERED | PURCHASE OR SALE | TIME ORDER PLACED | DOLLAR AMOUNT |
|----------------------|---------------|------------------|-------------------|---------------|
| 5-Jul 150 puts | 1⅝ | (P) | 10:00A.M. | not executed |
| 5-Jul 150 puts | 1¾ | (P) | 10:19A.M. | not executed |

(At 10:30 A.M. Texas time, a block of 295,000 shares crosses the tape at 5½ points below the last trade.)

| SECURITY DESCRIPTION | PRICE ORDERED | PURCHASE OR SALE | TIME ORDER PLACED | DOLLAR AMOUNT |
|----------------------|---------------|------------------|-------------------|---------------|
| 5-Jul 150 puts | 2 | (P) | 10:32A.M. | not executed |
| 4-Oct 140 puts | 4 (market) | (P) | 10:36A.M. | 1,673 |

On June 10, 1983, defendant D. Ball made or attempted the following stock transactions:

| SECURITY DESCRIPTION | PRICE ORDERED | PURCHASE OR SALE | TIME ORDER PLACED | DOLLAR AMOUNT |
|---|---|---|---|---|
| 5-Jul 150 puts | 2⅝ | (P) | 9:55A.M. | not executed |
| 5-Jul 150 puts | 3⅛ | (P) | 2:10P.M. | 1,642 |

Defendant D. Ball spent a total of $3,315, including transaction costs, in buying puts. On July 13 and 14, 1983, Mr. Ball sold the puts for a total profit of approximately $21,600 after sales costs.

### 3. *Defendant Joanne Ball*

Defendant Joanne Ball purchased three October 140 TI puts on June 10 at 2:20 P.M., C.D.T., through a new account opened that day. Mrs. Ball spent $1,336 on her purchase. She sold the puts on June 14 and 23 for a total profit of approximately $6,000 after transaction costs.

### 4. *Defendant Fleece*

On June 10, 1983, defendant Fleece purchased 45 July 140 TI puts and 20 October 140 TI puts. Mr. Fleece invested a total amount of $13,142 in purchasing the puts. On June 14 and 30, July 5 and 25, and August 15, Mr. Fleece sold his puts for a total profit of approximately $139,000 after sales costs.

### III. *The Parties' Contentions*

### A. *Plaintiff's Allegations*

The SEC made three basic arguments at trial. The plaintiff primarily argued that the defendants purchased the TI puts while in possession of the following material, nonpublic, corporate information:

(1) the shortfalls from forecasted TI Consumer Group home computer line sales;

(2) the plans under consideration for the reduction of TI Consumer Group home computer product line production;

(3) the extraordinary meetings and activity at TI's Consumer Group including the special assignment of the TI Vice-President of Finance to Lubbock;

(4) the June 10, 1983, special meeting of the TI Board of Directors;

(5) the rescheduling of the monthly Consumer Group forecast meeting to June 8 in connection with the special meeting of the TI Board of Directors; and

(6) that the Consumer Group would make a presentation to the TI Board of Directors at the June 10 special meeting.

As to the individual defendants, plaintiff argued that each had access to material inside information as part of their job responsibilities and that some exchanged the information with each other:

(1) that defendants Fox and D. Ball were aware of the latest developments in international sales and earnings, and the offshore sourcing of components;

(2) that defendant D. Ball received a message on June 7 notifying him of the June 10 Board meeting, and the planned analyses of reductions in home computer hardware and software production;

(3) that defendant J. Ball received and had access to sensitive financial information; and

(4) that defendant Fleece worked on new schedules in June that used a decreased range of 2.5 to 3 million computer consoles from the projected figure of 3.4 million.

Second, plaintiff argued that the defendants were under a duty to disclose the

alleged material, nonpublic corporate information or to abstain from trading. The plaintiff alleged that the defendants breached their duty, and that they acted with scienter.

Third, plaintiff claimed that the defendants were likely to continue such conduct in the future by engaging in similar transactions unless restrained and enjoined. Plaintiff further argued that the court should order disgorgement of the defendants' profits.

### B. *Defendants' Allegations*

The defendants denied that they had purchased put options with an intent to deceive or defraud investors, or that they traded on insider information. Furthermore, each defendant denied that they had violated or would violate federal securities laws. The defendants' arguments are further discussed below.

### IV. *Applicable Statutes*

The two statutory provisions that plaintiff claims the defendants violated are Section 10(b) of the Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

### A. *Section 10(b), Securities Exchange Act of 1934*

The basic purpose of the Exchange Act "is 'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor.'*" *Falls v. Fickling*, 621 F.2d 1362, 1370 (5th Cir.1980). To further this goal, "[s]ection 10(b) was designed as a catchall clause to prevent fraudulent practices" by both buyers and sellers. *Chiarella v. United States*, 445 U.S. 222, 227, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980).

Section 10(b) provides in pertinent part as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\*  \*  \*  \*  \*  \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1981).

### B. *Rule 10b–5*

Rule 10b–5 plays a major role in enforcing full disclosure as intended by the Exchange Act. The *Falls* court stated the classic situation where disclosure is required:

Close to the rule's heart lies the situation in which corporate insiders take advantage of their superior knowledge to profit at the expense of other shareholders by trading the corporation's stock.

*Falls*, 621 F.2d at 1370.

Rule 10b–5, provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1986).

### V. *Analysis of Case Law*

██ By alleging that the defendants traded on material inside information, plaintiff must prove the following: (1) that the defendants were insiders; (2) that the

information in defendants' possession was material; (3) that the defendants had a duty to disclose the alleged information or to abstain from trading; and (4) that the defendants acted with scienter.

To properly determine plaintiff's allegations, the court will define these terms.

### A. *Definition of Insider*

■ The term "insider" is far-reaching. It refers to corporate directors and management officers, but also includes "anyone in possession of material inside information." *Securities and Exchange Commission v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Insiders are individuals "who are in a special relationship with a company and privy to its internal affairs, and thereby suffer correlative duties in trading in its securities." *Cady, Roberts & Co.,* 40 S.E.C. 907, 912 (1961).

### B. *Definition of Materiality*

■ The test for materiality is an objective one. *Securities and Exchange Commission v. Blatt,* 583 F.2d 1325, 1331 (5th Cir.1978). A fact is material under Rule 10b–5 if "there is a substantial likelihood that a reasonable shareholder *would* consider the omitted information important in deciding upon his course of action." *Id.,* at 1330 (emphasis added); *Falls v. Fickling, supra; Wheat v. Hall,* 535 F.2d 874 (5th Cir.1976); *Cf. T.S.C. Industries, Inc., v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (materiality for purpose of Rule 14a–9, C.F.R. § 240.–14a–9).

### C. *The Duty to Disclose or to Abstain from Trading*

■ Because an insider has access to material inside information, he has a duty to disclose or to abstain from trading when in possession of such information. *Cady, Roberts & Co.,* 40 S.E.C. 907 (1961). The United States Supreme Court examined and discussed this duty in *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108,

63 L.Ed.2d 348 (1981), and *Dirks v. Securities and Exchange Commission,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). The Court stated that the duty to disclose or abstain rests upon two principles:

(i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and

(ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure.

*Dirks,* 463 U.S. at 653–54, 103 S.Ct. at 3261 (quoting *Chiarella,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1981). These principles are also the elements necessary to establish a Rule 10b–5 violation. *Id.*

■ The insider's duty is not binding, however, upon all who acquire inside information. The Court held in *Chiarella* that the duty "does not arise from the mere possession of nonpublic market information." *Chiarella,* 445 U.S. at 235, 100 S.Ct. at 1118. The duty to disclose does arise "when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' " *Id.,* at 228, 100 S.Ct. at 1114 (quoting Restatement (Second) of Torts § 551(2)(a) (1976)). Thus, an individual is not bound by this duty unless he occupies a trusted position in the corporation in which he wants to trade:

There can be no duty to disclose where the person who has traded on inside information 'was not [the corporation's] agent, ... was not a fiduciary, [or] was not a person in whom the sellers [of the securities] had placed their trust and confidence.'

*Dirks,* 463 U.S. at 654, 103 S.Ct. at 3261 (quoting *Chiarella,* 445 U.S. at 232, 100 S.Ct. at 1117). Therefore, only those persons who have such a duty commit fraud if they trade without disclosing material information. There can be no fraud without the duty to disclose or abstain.

### D. *Scienter*

■ In *Aaron v. Securities and Exchange Commission,* 446 U.S. 680, 691,

100 S.Ct. 1945, 1952, 64 L.Ed.2d 611 (1980), the Court held "that scienter is an element of a violation of § 10(b) and Rule 10b–5, regardless of the identity of the plaintiff or the nature of the relief sought." But, even where there is a breach of fiduciary duty in a securities transaction, it is not an automatic violation of Rule 10b–5. *Dirks*, 463 U.S. at 654, 103 S.Ct. at 3261. The key elements that must also be present are "manipulation or deception." *Santa Fe Industries v. Green*, 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977). In *Dirks*, the Court found that "an insider will be liable under Rule 10b–5 for inside trading only where he fails to disclose *material* nonpublic information before trading on it and thus makes 'secret profits.'" *Id.*, 463 U.S. at 654, 103 S.Ct. at 3261 (quoting *Cady, supra*, at 916, n. 31) (emphasis added).

Scienter is defined as the "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976), *reh'g denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). Negligence, alone, is insufficient to support an action for insider trading. *Id.*, at 214, 96 S.Ct. at 1391.

VI. *Application of the Law to Defendants*

■ Based upon the above definitions, the defendants were not insiders. Although defendants worked with sensitive information, the court finds that they were not insiders with respect to the material information that plaintiff alleges they used to purchase TI puts. Furthermore, the defendants were not bound by the duty to disclose or to abstain because they were not insiders. The court must now focus on whether the defendants traded on material information and if they acted with scienter.

A. *Materiality*

■ The SEC's main argument was that the defendants had material inside information relating to the June 10, 1983, announcement of a $100 million dollar loss, that they knew such an announcement would be made, and that they traded on this knowledge. In *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968), the court stated, however, that there should be a relationship between the alleged material information and the event which it predicts:

Whether facts are material within Rule 10b–5 when the facts related to a particular event and are undisclosed by those persons who are knowledgeable thereof will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.

*Id.*, at 849. This court finds that the connection between the SEC's evidence and TI's announcement on June 10, 1983, is lacking.

In the spring of 1983, TI's future appeared very prosperous. For the year 1982, TI realized a corporate profit of approximately $144 million of which 7% was contributed by the Consumer Group. Furthermore, at TI's Annual Shareholders' meeting in April, 1983, TI's President and CEO, Mr. J. Fred Bucy, stated that 1983 held the promise or being a more profitable year for TI than 1982.

The Consumer Group's internal data also predicted that 1983 would be profitable. The Consumer Group's forecast for May, 1983, contained no information that invalidated Mr. Bucy's statement made at the shareholders' meeting. Although the forecast predicted organizational losses of approximately $58 million and $22 million for the Consumer Group in the first and second quarters of 1983, the forecast estimated an organizational profit of approximately $82 million for the year ending on December 31, 1983. Furthermore, the evidence at trial showed that in May of 1983, TI was in the process of increasing production of its home computer, not decreasing production.

The plaintiff relied heavily upon allegations that defendants knew that TI would reduce production of its home computer. Although there were "what ifs" done contemplating reduced levels, these were not firm plans. Plaintiff stipulated that defendant Fox did not participate in the preparation of such "what ifs." [Stipulation 74]. Furthermore, plaintiff did not prove that any of the defendants knew of the

contents of such studies. Although defendant Fleece was told by his supervisor that computer production might be decreased, the information was incorrect and immaterial. In a Section 10(b) suit, "[s]uch sales figures, projections, forecasts and the like can only rise to the level of materiality when they can be calculated with substantial certainty." *James v. Gerber Products Co.*, 587 F.2d 324, 327 (6th Cir.1978). Upon review of the evidence, this court cannot find that the defendants had inside information relating to the June 10 announcement.

The plaintiff's other evidence was also unconvincing as to materiality. The fact that meetings were advanced, that corporate management visited the Lubbock facility, or that some of the defendants discussed securities trading with one another were not proven to be material facts.

As of the first part of June, 1983, the evidence showed that the information available to defendants confirmed that the Consumer Group would be producing at least 3 million computer consoles. Furthermore, the testimony showed that the June 10 announcement was an unexpected event for TI employees. Not even the President of the Consumer Group, Mr. Bill Turner, anticipated such a reduction. [Deposition of Bill Turner, pages 46, 47].

The court also finds important several stipulations to which the parties agreed:

"28. The opening of trading in TI common stock on the NYSE was delayed by approximately 2½ hours on the next trading day, Monday, June 13, 1983. TI common stock opened at $119, down $38.75 from the closing price before the announcement on June 10, 1983 of $157.75. The volume of trading in TI common stock increased from 89,100 shares on June 10 to 1.9 million shares on June 13 and 1.3 million shares on June 14. TI common stock closed at a low of $107.125 on Tuesday, June 14, 1983.

"29. The reason for this dramatic decline was the public announcement made by TI late on Friday afternoon, June 10th, that it was projecting an after-tax loss in the range of $100 million for the second quarter caused by developments in its home computer operations."

"72. The decision to reduce Consumer Group's plan for production of home computers to a level of 2 million units for 1983 was not made until the meeting of the members of the Board of Directors of TI on June 10, 1983.

"73. Neither Joe Fox, Carl Fleece, David Ball or Joanne Ball was involved or participated in the discussions at TI corporate headquarters in Dallas on June 9 and 10, 1983 concerning the decision to reduce Consumer Group's production plan for home computer consoles to 2 million units for 1983."

These stipulations show that the defendants were not involved in the decision-making process, within the Consumer Group or at the corporate level, that culminated in the reduced production of TI's home computer. Furthermore, the stipulations prove that the loss in TI's stock value was not caused by the defendants.

**B. *Scienter***

■ The plaintiff argued that the defendants acted with scienter, but scienter requires a high showing of misconduct. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, the Supreme Court carefully studied the language of Section 10(b) which prohibits the use of "any manipulative or deceptive device or contrivance" in securities trading:

The words "manipulative," "device," and "contrivance" ... [are] terms that make unmistakable a congressional intent to proscribe a type of conduct quite different from negligence. Use of the word "manipulative" is especially significant. It is and was virtually a term of art when used in connection with securities markets. *It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.*

*Ernst, Id.* (emphasis added). Plaintiff failed, however, to prove that the defendants acted with scienter.

Although the defendants' actions may appear suspicious or sinister in hindsight, whether the defendants acted with scienter "is a question of fact to be determined as of the time of the actions about which the plaintiff is complaining." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 546

(5th Cir.1981), *modified,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). As stated above, the defendants did not have material inside information and therefore, they were under no duty to disclose same. In June, 1983, the information available to defendants indicated that 1983 would be a profitable year for the Consumer Group. As of June 8, 1983, two days before TI's announcement of the $100 million loss, the Consumer Group's monthly forecast was consistent with the annual plan production of 3 million consoles. Based upon the evidence, the court cannot find that the defendants acted with scienter. Furthermore, the defendants did not depart from the standard of care imposed by Rule 10b–5 so as to act with scienter. *Huddleston,* 640 F.2d at 545.

The court also would point out that the SEC's own policy has not always included suing lower level employees of a corporation who may discover inside information:

> "Turning to the realm of possible defendants in the present and potential civil actions, the Commission certainly does not contemplate suing every person who may have come across inside information ... *the Commission in future cases normally should not join rank and file employees or persons outside the company such as an analyst or reporter who learns of inside information."*

*Dirks,* 463 U.S. at 664, n. 27, 103 S.Ct. at 3266, n. 27 (quoting Speech of Homer Budge to the New York Regional Group of the American Society of Corporate Secretaries, Inc. (Nov. 18, 1965), reprinted in The Texas Gulf Sulphur Case—What It Is and What It Isn't, The Corporate Secretary, No. 127, p. 6 (Dec. 17, 1965)(emphasis added).

VII. *Conclusion*

In a suit for alleged Section 10(b) and Rule 10b–5 violations, the SEC "is entitled to the benefit of all reasonable inferences and to have the evidence viewed in the light most favorable to it." *Securities and Exchange Commission v. Blatt,* 583 F.2d 1325 (5th Cir.1978). Upon review of the evidence, this court finds, however, that the SEC failed to prove by a preponderance of the evidence that the defendants traded on material information, and that they acted with scienter. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548.

Based upon the evidence, the court makes the following rulings:

(1) That the defendants did not possess material information concerning TI on June 9 and 10, 1983, or at any time prior thereto;

(2) That the defendants did not purchase TI puts based on material information concerning TI on June 9 and 10, 1983;

(3) That the defendants did not act with an intent to deceive or defraud investors in TI securities by purchasing TI puts on June 9 and 10, 1983; and

(4) That the plaintiff failed to prove that the defendants will violate the federal securities laws unless restrained from doing so.

Because the court finds that the defendants did not violate the federal securities laws, the plaintiff's prayer for injunctive relief and disgorgement is denied. *Securities and Exchange Commission v. Blatt,* 583 F.2d 1325.

A judgment will be entered in accordance with the above.

ORDER

This order is entered to supplement the court's Memorandum in this case, entered on October 14, 1986.

First, the court orders that all of the parties' stipulations in the case be incorporated into the Memorandum.

Second, the court makes the following additional findings of fact. Based upon the evidence and testimony at trial, the court finds that all the defendants had traded in securities prior to their purchase of TI puts in June of 1983. Defendant Fox purchased securities prior to June, 1983, and had traded in put and call options since early March of 1983 on the advice of his broker. Defendant David Ball made stock purchases prior to June, 1983, and had bought TI puts in April and May of 1983. Defendant Joanne Ball purchased securities in the early 1970's. Defendant Fleece had traded in securities prior to June, 1983. Furthermore, the court finds that the defendants did not violate TI policy in purchasing their TI puts.