**IN RE: Thao HUYNH, Debtor.**

**Georgia Lottery Corporation, Plaintiff,**

**v.**

**Thao Huynh, Defendant.**

**CASE NO. 15–56425–PWB**
**ADVERSARY PROCEEDING**
**NO. 15–5208–PWB**

United States Bankruptcy Court,
N.D. Georgia, Atlanta Division.

Signed April 7, 2016

---

Patrick W. Leed, Georgia Department of Law, Atlanta, GA, Bryndis W. Roberts, Jenkins & Roberts LLC, College Park, GA, for Plaintiff.

Hoang T. Nguyen, Law Office of Hoang Nguyen, Duluth, GA, for Defendant.

## ORDER

Paul W. Bonapfel, U.S. Bankruptcy Court Judge

Georgia Lottery Corporation seeks a determination that the debt owed to it by the Debtor based on her failure to account for funds arising from the sale of lottery tickets is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4). Georgia Lottery Corporation contends that entry of summary judgment is appropriate because, as a matter of fact and law, the Debtor committed defalcation in her fiduciary role as the owner of a lottery retailer.

The Debtor concedes that she is a fiduciary for purposes of § 523(a)(4). But the Debtor contends that the lottery tickets were stolen and that whether she committed an act of defalcation is a genuine issue of material fact precluding entry of summary judgment.

For the reasons stated herein, the Court concludes that the undisputed facts establish that the Debtor committed defalcation while acting in a fiduciary capacity and the resulting debt is excepted from discharge pursuant to § 523(a)(4).

*The Undisputed Facts*

The Debtor, Thao Huynh, is the 100% owner of Tran Huynh, LLC d/b/a Brown's Bridge Citgo. On November 26, 2013, Tran Huynh, LLC d/b/a Brown's Bridge Citgo entered into a Retailer Contract with the Georgia Lottery Corporation ("GLC") to sell Georgia lottery tickets at the retail store, Brown's Bridge Citgo ("Citgo").

Georgia law, the Georgia Retailer Rules and Regulations, and the Retailer Contract set forth the duties and responsibilities of a lottery retailer. Pursuant to these requirements, a retailer must deposit proceeds from the sale of lottery tickets into a designated bank account for collection via electronic funds transfer by the GLC. [Doc. 14–4, Exh. B, Retailer Contract, ¶ 5; Doc. 14–8, Exh. F, Retailer Rules and Regulations ¶ 2.12(A) ], Lottery ticket sales proceeds constitute a trust fund until paid to the GLC and a lottery retailer and its officers have a fiduciary duty to preserve and account for the proceeds collected. O.C.G.A. § 50–27–21(a). The Georgia Lottery Rules and Regulations require a lottery retailer to exercise control and supervision over its employees selling tickets and be fully responsible and liable for their conduct as it relates to the sale of lottery tickets. [Doc. 14–8, Exh. F, Retailer Rules and Regulations ¶ 2.04(D) ].

The activation of a packet of lottery tickets (an "Activated Pack"), triggers certain reporting and accounting requirements. A pack of instant tickets will settle (become a "Settled Pack") for the accounting period 21 days after the pack was activated. [Doc. 14–8, Exh. F, Retailer Rules and Regulations ¶ 2.11(C) ], All packs of instant tickets settled in an accounting period will be invoiced to the retailer. An accounting period for purposes of preparing retailer invoices is from Sunday at 6:00 a.m. through Saturday at midnight. [*Id.* at ¶¶ 2.11(A) and (B) ].

The GLC alleges that during the accounting weeks ending October 18, 2014, October 25, 2014, and November 1, 2014, the Debtor, Tran Huynh, LLC, and/or other individuals acting on their behalf activated, sold, and settled lottery tickets at the Citgo. Notwithstanding the sales, the GLC asserts that it was unable to collect proceeds of the activated, sold, and settled tickets during these weeks because Tran Huynh, LLC, its officers, employees, and/or agents failed to deposit sufficient funds in the designated lottery bank account at Bank of America.

GLC avers that the Debtor, as the owner and officer of Tran Huynh, LLC, failed to preserve and account and remit $30,784.07 in lottery ticket proceeds to it,[1] and that this conduct constitutes an act of defalcation by a fiduciary that renders the debt nondischargeable under § 523(a)(4).

The Debtor contends that she herself is a victim. The Debtor asserts that during the relevant accounting weeks she was absent from management of her store due to a pregnancy and birth and that during such time an employee stole the lottery tickets and cash proceeds.

The Debtor has not filed an affidavit or presented any evidence in support of her

1. Paragraph 23 of the GLC's Statement of Material Facts refers to "J & M Food Mart, LLC d/b/a Shell Food Mart." This appears to be an error because the included citation reference to Doc. 14–3, Exh. A, Affidavit of James Session, ¶ 26, accurately refers to "Tran Huynh, LLC."

response to the motion for summary judgment. Her unsworn narrative, as set forth in her brief, is that she did not possess or sell the lottery tickets and she did not collect the cash proceeds. [Doc. 15], Although she terms the tickets "lost" [Doc. 15 at 4], she also states that the lottery tickets and cash proceeds were stolen by her employee. [Doc. 15 at 1,3], She contends that defalcation cannot be established by the fact that she did not file a police report or produce the video surveillance of the employee's acts; instead, she focuses on her conduct and the fact that she did not misappropriate any funds herself.

Notwithstanding the Debtor's failure to support her response with evidence, the Court will consider the discovery responses[2] and the Debtor's deposition[3] attached to the Plaintiff's motion because she provided them under penalty of perjury, they support her version of events, and they demonstrate her subjective intent. In her deposition, the Debtor offered the following sworn testimony regarding the failure to produce the lottery tickets or the proceeds.

The Debtor employed three people at the Citgo. [Dep. 11:10], She had no paperwork on any of them. [Dep. 11:4, 15–16], If any paperwork existed, the Debtor testified that after she filed bankruptcy, she threw away all of the files and records. [Dep. 11:21–22; 27:3–4], The debtor hired a former customer, John, in April 2014. [Dep. 21:10–12, 14; 22:2–3]. He did not fill out an application and asked to work there. [Dep. 21:20–22]. John's daughter, Erin, came to work at the Citgo after he did. [Dep. 22:6–7]. There may have been only one or two employees at the Citgo at the time the lottery tickets were stolen.

[Dep. 22:10–13; Doc. 14–5, ¶ 13; Doc. 14–6, ¶ 13].

The Debtor gave birth to a baby on September 21, 2014. [Dep. 5:21–22]. For approximately one month—some time before and after the birth—she did not go into the Citgo. During her absence, her employee, John, was left to supervise the store. [Dep. 12:14–16]. John (as well as the other employee(s)) knew how to "activate" lottery tickets via a passcode. [Dep. 16:23–24; 17:10–11]. The Debtor also gave John her checkbook in the event he needed to order and pay for inventory for the store. [Dep. 16:2–5].

The Debtor planned to come into the store once per week during her month-long absence to collect lottery winnings and deposit into the lottery bank account. [Dep. 15:18–25]. She also testified, though, that for a whole month she did not go into the gas station so that during this month of sales she did not take the lottery money for deposit. [Dep. 8:7–10].

About a month before the birth of her baby, the Debtor began to notice a significant increase in the number of "sold" lottery ticket rolls. [Dep. 18:18–25; 19:1–8]. Approximately two to three weeks after her baby was born, the Debtor "turned on the video recording, and I see him stealing tickets and he scratched himself. Because there was no customers." [Dep. 19:12–14]. Thus, she explained, John stole the tickets before the baby's birth, but she did not discover this until two to three weeks after the baby's birth. [Dep. 19:24–25; 20:1–5]. The Debtor destroyed the video surveillance prior to the bankruptcy filing. [Dep. 14:15–17].

When the Debtor discovered that John was stealing the tickets, she "went to the gas station and I took over, I worked.

**2.** Doc. 14–5, Doc. 14–6, Exhibits C and D.

**3.** Doc. 14–11, Exhibit I, hereinafter Deposition or "Dep."

And then when I came back in to work and I realized that all of the alcohol beverages sales and etcetera, etcetera, all the sales and cigarettes as well, he would sell them and take cash and put it in his own pocket." [Dep. 20:14–19].

The Debtor, however, did not call the police. [Dep. 13:15]. She explained, "Well, you know it's a Vietnamese culture; we never like to get law enforcement involved. And I've never called the cops before on anything, so I wouldn't know how to. Even though the neighbors around the Citgo gas station offered and advised me to call the cops, I—however, I still was afraid and did not call." [Dep. 13:17–23]. When asked by GLC's attorney whether it would be "okay with you" if John was arrested, the Debtor responded, "No." [Dep. 23:14–16]. The Debtor explained, "Well, what's stolen is stolen and what's lost is lost. I can't get it back. I just had a child. It's too much to deal with. I just want to get—start over fresh . . ." [Dep. 13:25; 14:1–3].

At some point after she discovered that John was stealing, the Debtor testified that he promised to pay her back, but did not. [Dep. 29:16–21]. She also later learned that John previously worked at a Chevron station near her Citgo and he had stolen lottery tickets there, as well. [Dep. 24:3–14].

*Section 523(a)(4)*

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

There is no dispute that the Debtor is a fiduciary for purposes of § 523(a)(4). [Doc. 15 at 3, "Defendant does not dispute the fact that [she] is a fiduciary of Plaintiff"]. The Debtor entered into a retailer contract with the GLC in her capacity as owner and officer of Tran Huynh, and O.C.G.A. § 50–27–21 imposes a fiduciary

duty upon her, as an officer, to preserve and account for lottery proceeds. The only issue for the Court is whether the Debtor's conduct constitutes defalcation as a matter of fact and law.

In *Bullock v. BankChampaign, N.A.,* —— U.S. ——, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013), the Supreme Court held that "defalcation" for purposes of § 523(a)(4) requires a culpable state of mind that involves knowledge of or gross recklessness with respect to improper fiduciary behavior.

Defalcation, unlike fraud, "may be used to refer to nonfraudulent breaches of fiduciary duty." *Id.* The *Bullock* Court explained, *id.* at 1759–60 (emphasis added):

Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. *Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty.* ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). See id., § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include " 'wilful blindness' "). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding

person would observe in the actor's situation." Id., § 2.02(2)(c), at 226 (emphasis added). Cf. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

■ Thus, after *Bullock*, in order for the Court to conclude that a debt is nondischargeable due to "fraud or defalcation while acting in a fiduciary capacity," it must find that "the debtor acted with wrongful intent, or, at a minimum, with a conscious disregard of his or her fiduciary duties." *Jantz v. Karch (In re Karch)*, 499 B.R. 903, 906 (10th Cir. BAP 2013).

In *Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921 (7th Cir.2016), the Seventh Circuit recently addressed the subjective recklessness required to establish defalcation post-*Bullock*. In *Jahrling*, the Seventh Circuit affirmed the bankruptcy court's finding that the debtor, a lawyer, committed defalcation in a fiduciary capacity with respect to his client. On appeal, the debtor argued that the bankruptcy court committed error by applying an objective standard to determine defalcation. The Seventh Circuit rejected this argument, concluding that the bankruptcy court drew inferences about the debtor's state of mind based on objective circumstances, but it applied the correct subjective standard.

In reaching this conclusion, the *Jahrling* Court explained that the bankruptcy court found that the debtor's breaches of an attorney's fiduciary duty to his client "were so basic and the risk of harm to the client so obvious that [the debtor] must have recognized them and proceeded despite the risk." *Jahrling*, at 926. This, the court concluded, was an appropriate state-of-mind standard that satisfied *Bullock* standard for purposes of § 523(a)(4).

■ This Court finds the reasoning in *Jahrling* instructive. Thus, in order for the Plaintiff to prevail on its § 523(a)(4) claim, the Court must conclude that either (1) the Debtor acted with knowledge of improper fiduciary behavior or (2) that the risks were so obvious that she must have recognized them yet went forward, acting in such a way that her conduct constituted a gross deviation from standards of conduct expected in her fiduciary role.

■ Based upon the undisputed facts as demonstrated by the Debtor's sworn deposition testimony, the Court concludes that the Debtor's failure to account for lottery funds held in trust for the GLC was an act of defalcation while acting in a fiduciary capacity that renders the debt nondischargeable pursuant to § 523(a)(4).

*Bullock* does not require a finding that the Debtor intentionally violated her fiduciary duty and the evidence does not demonstrate this. Nevertheless, the Debtor's conduct was grossly reckless because the breaches of conduct "were so basic and the risks ... so obvious that [the debtor] must have recognized them and proceeded despite the risk." *Jahrling*, at 926.

The decision to become a lottery retailer is a serious endeavor. It renders the officer personally liable for any failure to account for sale proceeds. This is because the money does not belong to the retailer; it belongs to the GLC. As a result, a retailer must make sound business decisions regarding employment and security to ensure that she can fulfill her fiduciary responsibilities to the GLC.

The Debtor employed an individual, John, and literally turned over her keys and checkbook to him for a month. John, a regular customer, approached her about a job and there is no evidence the Debtor did any type of background check on him.

She did not require him to fill out an application and has no records for him other than a telephone number and a general idea of where he lives.

Even when she was alerted to the unusually large number of tickets being activated, she did not take immediate action. And when she discovered the theft, she not only failed to notify the police, she destroyed the video surveillance tapes and her files and records.

In her deposition testimony the Debtor indicated that she failed to call the police for cultural reasons. A debtor's culture might be a factor in certain situations, such as where all parties share the same cultural understanding or the transaction itself has a cultural aspect. But that is not the case here. The Debtor entered into a contract with GLC to sell lottery tickets to the public in a commercial setting. Her subjective cultural beliefs about the role of the police are irrelevant given the nature of her business and the conduct at issue.

While the Court is sympathetic to the stress the Debtor experienced in balancing a pregnancy and care of a newborn with the operation of a business, her conduct was such a gross deviation from the standard of conduct necessary to operate as a lottery retailer, the Court cannot reach any other conclusion than the failure to account for the lottery proceeds constitutes a defalcation while acting in a fiduciary capacity. Based on the foregoing, it is

ORDERED that the Plaintiff's motion for summary judgment is granted. The debt owed to the GLC in the amount of $30,784.07 is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

**IT IS ORDERED**